

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-2-1998

# Brokerage Concepts v. US Healthcare Inc (Part II)

Precedential or Non-Precedential:

Docket 96-1891,96-1922,96-1923,96-1892,97-1013,97-1014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Brokerage Concepts v. US Healthcare Inc (Part II)" (1998). *1998 Decisions.* Paper 66.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/66

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 2, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-1891, 96-1892, 96-1922, 96-1923
97-1013, and 97-1014

BROKERAGE CONCEPTS, INC.

v.

U.S. HEALTHCARE, INC.; CORPORATE HEALTH
ADMINISTRATORS, INC.; UNITED STATES HEALTH CARE
SYSTEMS OF PENNSYLVANIA, INC., d/b/a THE HEALTH
MAINTENANCE ORGANIZATION OF PENNSYLVANIA;
RICHARD WOLFSON; SCOTT MURPHY;
WILLIAM BROWNSTEIN

Richard Wolfson, Scott Murphy and William Brownstein,
Appellants in No. 96-1891

U.S. Healthcare, Inc.; United States Health Care Systems
of Pennsylvania, Inc., d/b/a The Health Maintenance
Organization of Pennsylvania and Corporate Health
Administrators, Inc.
Appellants in No. 96-1892

U.S. Healthcare, Inc.; Corporate Health Administrators, Inc.;
United States Health Care Systems of Pennsylvania, Inc.,
d/b/a The Health Maintenance Organization of
Pennsylvania; Richard Wolfson; Scott Murphy; William
Brownstein,
Appellants in No. 96-1922

Brokerage Concepts, Inc.,
Appellant in No. 96-1923

U.S. Healthcare, Inc.; United States Health Care Systems of
Pennsylvania, Inc., d/b/a The Health Maintenance
Organization of Pennsylvania and Corporate Health
Administrators, Inc.,
Appellants in No. 97-1013

Richard Wolfson; Scott Murphy; and William Brownstein,
Appellants in No. 97-1014

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 95-cv-01698)

Argued: July 22, 1997

Before: BECKER, MANSMANN, and ROSENN,
Circuit Judges.

(Filed April 2, 1998)

     a. The Definition of "wrongful".

In Enmons, the Court faced the question whether the use
of violence in a labor strike to obtain higher wages and
other benefits was extortion within the meaning of the
Hobbs Act. The Court reviewed the wording of the Act and
its legislative history and determined that such conduct
was not extortion. In reaching its decision, the Court
interpreted the word wrongful, which is not defined in the
Act, as follows:

> The term "wrongful," which on the face of the statute
> modifies the use of each of the enumerated means of
> obtaining property -- actual or threatened force,
> violence, or fear -- would be superfluous if it only
> served to describe the means used. For it would be
> redundant to speak of "wrongful violence" or "wrongful
> force" since, as the government acknowledges, any
> violence or force to obtain property is "wrongful."
> Rather, "wrongful" has meaning in the Act only if it
> limits the statute's coverage to those instances where
> the obtaining of the property would itself be "wrongful"

48

> because the alleged extortionist has no lawful claim to
> that property.

Id. at 399-400 (emphasis added).

The ability to defend against an extortion charge based
on a lawful claim to the property obtained has been dubbed
the "claim of right" defense to extortion. See United States
v. Agnes, 753 F.2d 293, 298 (3d Cir. 1985). Since Enmons
dealt with the use of force to obtain property, and
concluded that it was not extortion, read broadly, Enmons
could stand for the principle that in all extortion cases,
even "inherently" wrongful actions such as the use or
threatened use of force or violence, do not constitute
extortion where the defendant has a lawful claim to the
property obtained. This broad application of Enmons, i.e.,
outside of the labor context, has, however, been uniformly
rejected by the courts of appeals out of a fear that it would
"effectively repeal the Hobbs Act." See United States v.
Cerilli, 603 F.2d 415, 419 (3d Cir. 1979).

The effort to limit the potential impact of Enmons has led
to a line of cases wherein this Court and others have
refused to extend the claim of right defense to defendants
accused of using actual or threatened force or violence to
obtain property outside of the labor context. For example,
in United States v. Agnes, supra, the defendant was
convicted of extortion for using threats of force and actual
violence in seeking property which was arguably his under
state law. On appeal, he argued that the district court erred
in refusing to allow him to assert a claim of right defense
and in failing to properly instruct the jury that it is not
wrongful to obtain property to which one has a legal right.
See 753 F.2d at 297. We noted that defendant's contentions
were predicated on Enmons and held that, contrary to
defendant's suggestion, Enmons did not create a general
claim of right defense in all cases involving the threatened
or actual use of force or violence. Instead we interpreted
Enmons to "create a claim of right defense only in . . .
situations [such as those present in Enmons] in which the
use of force is expressly identified by Congress as being
outside the purview of the Hobbs Act." Id. at 299 (emphasis
added). Other cases, noted in the margin, have similarly

49

limited the reach of the claim of right defense in cases involving the threatened or actual use of force or violence.[21]

The present case does not fall within this line of cases limiting Enmons since it solely involves the accusation of the wrongful use of the fear of economic loss. Unlike the use or threatened use of force or violence, the use of economic fear in business negotiations between private parties is not "inherently" wrongful. See Sturm, 870 F.2d at 773 (citation omitted); United States v. Clemente, 640 F.2d at 1077; Hall Am. Ctr. Assoc. Ltd. Partnership v. Dick, 726 F. Supp. 1083, 1095 (E.D. Mich. 1989). Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions. This economic reality leads us to conclude that the reach of the Hobbs Act is limited in cases, such as this one, which involve the use of economic fear in a transaction between two private parties. The limitation we apply is that set forth in Enmons: that a defendant is not guilty of extortion if he has a lawful claim to the property obtained.

We find support for our conclusion in the law of other circuits. The Second Circuit recognized the issues and concerns affecting this case in United States v. Capo, 791 F.2d 1054, 1062 (2d Cir. 1986), vacated in part, on other grounds, 817 F.2d 947 (2d Cir. 1987) (in banc), when it stated that:

_____

21. See United States v. Zappola, 677 F.2d 264, 269, 70 (2d Cir. 1982) (Enmons inapplicable where businessmen beat and threatened victim to coerce payment of alleged debt); United States v. Porcaro, 648 F.2d 753, 759-60 (1st. Cir. 1981) (claim of right to property irrelevant where force or threats are used in resolution of contractual dispute); United States v. Kattar, 840 F.2d 118, 123 n.2 (1st Cir. 1988) ("Except in certain labor contexts . . . using threats of violence to induce the payment of money is unlawful, regardless of the extortionist's possible legal right to the funds at issue."); United States v. Sturm, 870 F.2d 769, 772-73 (1st Cir. 1989) (defendants "claim of right" to property obtained from victim is proper defense outside of labor context only if defendant did not use "inherently wrongful" means such as force or violence to obtain the property); United States v. Warledo, 557 F.2d 721, 729-30 (10th Cir. 1977) (Enmons inapplicable to Indian tribe's threats and violence to pursue allegedly valid claim against railroad); United States v. Cohen, 738 F.2d 287, 289 (8th Cir. 1984).

> We recognize, of course, that fear of economic loss
> plays a role in many business transactions that are
> entirely legitimate; awareness of that fear and use of it
> as leverage in bargaining, in which each side offers the
> other property, services, or rights it legitimately owns
> or controls, is not made unlawful by the Hobbs Act.
> What the Act reaches is not mere hard bargaining but
> the exploitation of the fear of economic loss in order to
> obtain property to which the exploiter is not entitled.

> (emphasis added).

See also United States v. Clemente, 640 F.2d at 1076-78
(use of fear of economic loss is wrongful when employed to
achieve the wrongful purpose of obtaining property to
which one is not entitled).

The First Circuit has explicitly extended the claim of right
defense to cases involving solely the fear of economic harm.
See Sturm, 870 F.2d at 773 ("[F]or purposes of the Hobbs
Act, the use of legitimate economic threats to obtain
property is wrongful only if the defendant has no claim of
right to that property."). The position of the First and
Second Circuits is mirrored in the federal pattern jury
instructions for the Hobbs Act. In those instructions
"wrongful" is defined as "mean[ing] that the defendant had
no lawful claim or right to the money or the property
(he)(she) sought or attempted to obtain", and district courts
are directed that this definition "should be given only in
cases involving a fear of economic loss or in trials
concerning the use of violence by union leadership to
secure higher wages for the membership as opposed to
securing money for themselves." E. Devitt et al., Federal
Jury Practice and Instructions, Criminal, S 45.08 & notes
(4th ed. 1990). We believe that the position of the First and
Second Circuits is sensible, and adopt it here.

### b. Lawful Versus Unlawful Claims to Property

Our conclusion that the defendants are not guilty of
extortion if they had a lawful claim to the property obtained
from Gary's, while focusing our inquiry, does not resolve
the issue before us since the line separating lawful from
unlawful claims to property obtained in business

negotiations is by no means self evident. Once again, we start with Enmons which, although addressing extortion through force or violence, provides direction as to the distinction between lawful and unlawful claims to property.

The Court in Enmons, having held that a Hobbs Act conviction could not be predicated on violence related to union activity that was aimed at obtaining property to which the alleged extortionist had a lawful claim, found that the defendants, union members and officials, had a lawful claim to the property -- in the form of wages and other employment benefits -- that they obtained from the employer. The Court found that where violence is employed "to achieve legitimate union objectives, such as higher wages, in return for genuine services which the employer seeks . . . there has been no `wrongful' taking of the employer's property; he has paid for the services bargained for, and the workers receive the wages to which they are entitled in compensation for their services." 410 U.S. at 400. This scenario was distinguished from cases where "union officials threatened force or violence against an employer in order to obtain personal payoffs, and where unions used the proscribed means to exact `wage' payments in return for `imposed, unwanted, superfluous and fictitious services' of workers." Id. In such cases, the union officials would not have a lawful claim to the property obtained, and thus the conduct would fall within the reach of the Hobbs Act.

We find particularly illuminating the application of Enmons' basic teaching by the District Court for the Southern District of New York in Viacom Int'l v. Icahn, 747 F. Supp. 205 (S.D.N.Y. 1990), aff'd on other grounds, 946 F.2d 998 (2d Cir. 1991), a case involving the allegation of extortion through the wrongful use of the fear of economic loss. In Viacom, the defendants were accused of purchasing substantial stock in the plaintiff company (Viacom) and then coercing the plaintiff to buy its stock back for cash, stock warrants, and free advertising -- all allegedly under a threat of a corporate takeover. In return for the requested "greenmail," the defendants agreed not to buy the plaintiff's stock (or otherwise seek control of the plaintiff) for a period of eleven years. See id. at 207-09. Following this

transaction, the plaintiff brought a civil RICO suit alleging, inter alia, that defendants had violated the Hobbs Act by obtaining above-market consideration for their shares from plaintiff with plaintiff's consent, with such consent induced through the wrongful use of economic fear. See id. at 210. On defendants' motion for summary judgment, the court dismissed as a matter of law the allegation that the challenged practice constituted extortion. See id. at 213.

The court recognized that it was faced with a case in which the alleged extortion victim received something of value -- an eleven-year standstill covenant, 3,498,200 shares of common stock, and, thereby, relief from the threat of a corporate takeover. It then surveyed existing case law in which the victim received something of value in exchange for his property, and found that in these circumstances "some acts constitute extortion and others are found to be `hard bargaining.' " Id. at 212-13. The court drew the following distinction between the two:

> In a "hard bargaining" scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.

Id. at 213.

Applying this framework, the court used as examples of extortion, the "personal payoff cases" addressed in Enmons. In those cases the defendants "had no lawful claim to the property they received from the victims in exchange for providing the victims with influence and goodwill which quelled the victims fears of harm to their economic interests." Id. While the victim received something of value in return for this payment, "the victim [was] entitled by law to be free of the fear he [was] quelling by giving property to the defendant . . . [and thus] the `something of value' the victim receive[d] [was], as a matter of law, as `imposed, unwanted, superfluous and fictitious' as the hiring of a second worker to do the job that another worker is already doing." Id. (citations omitted).

53

The court then focused on those cases in which the victim receives something of value yet the conduct is found to be hard bargaining. It drew examples of this conduct from the Second Circuit's opinion in United States v. Capo, 791 F.2d at 1062–63, which stated that:

> [a]lthough a job applicant who has long been out of work may have a fear of not obtaining employment that would constitute a fear of economic loss within the meaning of the Act, the Act would not ordinarily reach, for example, the efforts of a prospective employer to bargain down the level of compensation to be paid the applicant. Nor would it reach the normal activities of an employment agency in dealing with the applicant even if, for example the agency required payment from its applicants of some sort of filing fee, service charge, or contingent fee.

In these cases, the defendant is legally entitled to the property obtained from the victim since he has provided real value in exchange for that property, and the victim has no preexisting right to be free of the fear he is quelling in return for his payment to the defendant.

A further example of hard bargaining was provided by the facts of Viacom itself. Since the plaintiff had received something of value in return for the property transferred to the defendants, the court looked to whether the law entitled "Viacom to a right to pursue its business interests free of the problems and fears caused by the threat of a takeover by defendants." 747 F. Supp. at 213. The court found that the law granted no such entitlement and thus that

> any intentional exploitation of fear by defendants was only part of "hard bargaining" in a deal which resulted in plaintiff receiving a benefit to which it was not otherwise entitled by law. Accordingly, defendants did not obtain property from plaintiff to which they had no lawful claim and therefore did not commit extortion.

Id. at 213–14.

In the present case, the property that U.S. Healthcare obtained from Gary's was the payments made by Gary's to CHA pursuant to its TPA contract. In return for this

54

property, U.S. Healthcare gave Gary's access to its provider network -- something that is of considerable value to Gary's. Thus, like the court in Viacom, we deal with a very narrow subset of the potential universe of extortion cases: one involving solely the accusation of the wrongful use of economic fear where two private parties have engaged in a mutually beneficial exchange of property. While we believe that the fact-bound nature of this type of case will not supply a generalized precept, we are convinced by the logic of Viacom that BCI's extortion claim can only survive if Gary's had a right to pursue its business interests free of the fear that it would be excluded from the provider network. Albeit with misgivings, we find that it had no such right.

The chief obstacle to BCI's claim is the fact that Pennsylvania, unlike many other states, has not adopted an "Any Willing Provider" law which compels HMOs to allow all interested and minimally qualified providers into their networks. If such a law were in force, then Gary's would have had a legal entitlement to be a member of the provider network and thus to be free of the fear that it would be excluded from that network if it did not switch TPA providers.[22] However, in the absence of such a law, Gary's has no right of access to the U.S. Healthcare network and thus U.S. Healthcare could have denied Gary's access to its network for any reason, or for no reason at all. Under these conditions, U.S. Healthcare had the right to exchange the valuable consideration of inclusion in its network in return for consideration from Gary's in the form of its TPA contract. We thus conclude that this case provides an example of hard bargaining rather than extortion.[23]

_____

22. Indeed, if Pennsylvania had such a law not only might the outcome of this suit, at least as it pertains to the RICO counts, be different, but
it is likely that the underlying facts would never have occurred. Those facts, which demonstrate how heavy-handed tactics can be effectively applied by a large corporation (U.S. Healthcare) against a small firm (Gary's) in this context, might suggest to the Pennsylvania General Assembly that it is time to enact an Any Willing Provider law in Pennsylvania.

23. This is also not a case where U.S. Healthcare exerted monopoly power in the market for pharmaceutical customers. Under such circumstances, the antitrust laws might well confer on Gary's the legal right to be free of the economic coercion arising from U.S. Healthcare's monopoly. However, we are not presented with such a case and thus do not opine on the potential success of such a theory.

BCI raises several arguments in opposition to this conclusion. First, BCI submits that even if Gary's had no right to membership in the provider network per se, it did have a right to compete for membership in that network free from coercion. BCI attempts to ground this right in our holding in Addonizio, supra. In that case, we considered extortion charges based on public corruption in which government officials demanded kickbacks from contractors, suppliers and engineers engaged in public works projects for the city of Newark, New Jersey. In upholding defendants' extortion convictions, we determined that, while the contractors have no right to obtain a contract with the city, they "have a right to expect that when they incur time and expense to bid on public projects, they will be awarded contracts when their bids are lowest . . . . The City of Newark had systematically destroyed this right." 451 F.2d at 73 (emphasis added).

Our holding in Addonizio is distinguishable since it is based on the right of private citizens to compete for government contracts on a level playing field. Such a right is solidly embedded in public policy. See also United States v. Collins, 78 F.3d 1021, 1030 (6th Cir.), cert. denied, ___ U.S.___, 117 S. Ct. 189 (1996) (upholding Hobbs Act conviction of husband of Kentucky Governor charged with soliciting political contributions in exchange for right to contend for state contracts since "[payors] acted out of fear that without payments they could lose the opportunity to compete for government contracts on a level playingfield, an opportunity to which they were legally entitled."). In this case, involving solely private parties, and in the absence of an Any Willing Provider Law, Gary's had no such right to a level playing field.

c. Evidence of Other Unlawful Objectives

BCI also argues that even if U.S. Healthcare did not have the unlawful objective of obtaining property to which it had no lawful claim, it had three other unlawful objectives that convert the economic coercion at issue here into extortion.24

_____

24. Since we conclude that each of these allegations of wrongful objectives lacks support, we need not decide whether proof that defendants' possessed one of these objectives would be sufficient to convert U.S. Healthcare's use of the fear of economic loss into extortion where U.S. Healthcare had a lawful right to the property obtained.

56

They are (1) violation of Pennsylvania's insurance fraud statute; (2) violation of New Jersey's Any Willing Provider law; and (3) violation of U.S. Healthcare's own internal procedures. Of these three objectives, the jury was only instructed as to BCI's theory that the defendants use of economic fear was wrongful because it had the unlawful objective of violating the Pennsylvania Insurance Fraud statute, and thus we address only that theory in the text.[25] The other two theories, on which the jury was not instructed, are rejected summarily in the margin.[26]

The Pennsylvania insurance fraud statute provides that:

> a health care provider may not compensate or give
> anything of value to a person to recommend or secure
> the provider's service to or employment by a patient or
> as a reward for having made a recommendation
> resulting in the provider's service to or employment by
> a patient.

_____

25. The district court also instructed the jury that one such unlawful objective would be "a violation of the Federal antitrust laws." In light of the fact that we vacate the antitrust verdict, this instruction alone might compel us to vacate the jury finding with respect to extortion and, indeed, to the whole of the RICO count. However, since we find that both claims fall of their own weight, we need not rely on this flawed jury instruction as grounds for reversal, and thus do not address BCI's contention that U.S. Healthcare waived any objection to the instruction.

26. BCI's claim that U.S. Healthcare had the unlawful objective of violating the New Jersey Any Willing Provider Law, see N.J.S. 26:2J-4.7(a)(2), fails because BCI has RICO standing only to recover for the loss of its TPA contract with Gary's, all of whose pharmacies are located in Pennsylvania.

BCI's argument that U.S. Healthcare had the unlawful objective of violating its own internal regulations is founded on BCI's assertion that U.S. Healthcare's internal regulations required it to admit into its network all pharmacies whose applications met U.S. Healthcare's admission criteria. BCI's brief, however, does not clearly specify the exact regulation(s) in which such a requirement is contained, and it is not at all clear that such regulations exist. At all events, BCI's claim must fail since, even if U.S. Healthcare's regulations did contain such a requirement, we see no reason why violation of an internal regulation regarding provider admission would be unlawful.

18 Pa. Cons. Stat. Ann. S 4117(b)(2) (Purdon 1997). We disagree with BCI that the jury could reasonably have concluded that U.S. Healthcare's conduct violated this statute. By its terms the statute forbids providers from buying recommendations or referrals of patients, and is thus properly characterized as an "anti-kickback" statute directed at providers rather than insurers, such as HMOs. Even if we ignored the statute's clear focus, BCI's contention that U.S. Healthcare violated the statute by referring patients to pharmacies that agreed to give them a benefit fails for two reasons. First, the record does not support an inference that U.S. Healthcare recommended that its members patronize any particular pharmacy in the network. Second, health care providers generally give HMOs something of value (at least in the form of lower prices) in exchange for admission into a network. Thus, if the allegations in this case violated the statute, HMOs might be rendered illegal in Pennsylvania. The Pennsylvania General Assembly could not have so intended.

2. Commercial Bribery

The Pennsylvania commercial bribery statute states that a "person who holds himself out to the public as being in the business of making disinterested selection, appraisal, or criticism of commodities or services" violates the law "if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism." 18 Pa. Cons. Stat. Ann. S 4108(b) (Purdon 1983). Thus, in order for the conduct in this case to constitute commercial bribery, BCI would have to prove (1) that U.S. Healthcare held itself out as being in the business of making disinterested selection, appraisal or criticism of health care providers; and (2) that it solicited, accepted, or agreed to accept a benefit to influence that selection, appraisal or criticism.

BCI argues that the jury had sufficient evidence before it from which to conclude that the defendants held themselves out to the public as selecting providers disinterestedly, based solely on the quality of the provider. BCI points to the testimony of defendant Wolfson to the effect that U.S. Healthcare holds itself out as having quality assurance procedures, and to a snippet from U.S. Healthcare's annual report which boasts of

58

U.S. Healthcare's performance monitoring and quality assessment systems for the health care providers in its networks, and which states that the quality assessments systems "begin with the certification of providers before they can become eligible to care for our members."

U.S. Healthcare responds convincingly that this evidence merely documents the reality that provider quality was a necessary, but not always sufficient, criterion for inclusion in its network. The "bottom line" is that U.S. Healthcare is not a disinterested appraiser of health care providers; it is an HMO. An HMO is designed to provide access to low-cost, good quality health care, at a profit for the HMO. Thus, while U.S. Healthcare is required by law to allow only qualified providers into its network,[27] and chooses its providers from the set of qualified providers, it alone decides whom within that set to admit largely on the basis of a provider's willingness to furnish care at managed care rates. There is nothing disinterested about this process, and we find no evidence to support a finding that U.S. Healthcare represented to the public that the process was, in fact, disinterested.

Finally, we note that the essence of BCI's claim is that U.S. Healthcare used its quality assurance machinery not just to assure quality, but also to coerce Gary's into giving CHA its TPA business. The commercial bribery statute, however, is not concerned with the motive underlying U.S. Healthcare's use of its quality assurance procedures, so long as U.S. Healthcare did not hold itself out as a disinterested appraiser of pharmacies. Thus, while evidence of such coercion provides fodder for BCI's tortious interference claim, see infra, it is misplaced in the context of an argument regarding the carefully circumscribed crime of commercial bribery. In sum, since BCI failed to produce evidence to support a finding that U.S. Healthcare held itself out as a disinterested appraiser of pharmacies, we must set aside the jury's finding that some of the defendants committed commercial bribery.

_____

27. See 28 Pa. Code. S 9.71 (1997).

3. Mail and Wire Fraud

The federal mail and wire fraud statutes, 18 U.S.C.
S 1341 and 18 U.S.C. S 1343, prohibit the use of the mails
or interstate wires for the purpose of carrying out any
scheme or artifice to defraud. See Kehr Packages, Inc. v.
Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991). "A
scheme or artifice to defraud need not be fraudulent on its
face, but must involve some sort of fraudulent
misrepresentations or omissions reasonably calculated to
deceive persons of ordinary prudence and comprehension."
Id. at 1415 (internal quotations omitted).

BCI contends that there was ample evidence for the jury
reasonably to have found that the defendants engaged in a
scheme to defraud Gary's concerning the nature and
purpose of the quality assurance audit and freeze of the
Eagleville store, and the reason for the refusal to process
the Abington store application. BCI submits that, whereas
the defendants led Gary's to believe that legitimate quality
assurance concerns motivated their actions,
U.S. Healthcare really intended to use the audit as a means
to pressure Gary's into switching to CHA as its TPA.
Assuming that BCI is correct regarding U.S. Healthcare's
true motivation (and the record supports their view), the
failure to disclose this motivation does not create a
cognizable "scheme to defraud" in the absence of any
evidence that this omission was "reasonably calculated to
deceive" Gary's.

Here, such a conclusion is not supported by the record
evidence, which instead supports the conclusion that
Gary's was well aware of the fact that the audits were
motivated either by a desire to retaliate against it for
canceling the contract with U.S. Healthcare and switching
to a self-insurance program, or by a desire to encourage it
to choose CHA as its TPA. Indeed, the thrust of plaintiff's
case is that Gary's was so acutely aware of this fact that it
felt that it had no choice but to switch TPA providers.
Moreover, if U.S. Healthcare's intention was to use the
audits as a means of coercing Gary's to switch TPA

60

providers, it would make little sense to conceal this underlying motivation from Gary's.28

As was the case with BCI's commercial bribery claim, the evidence of defendants' heavy-handed business tactics and, specifically, of their misuse of the quality assurance machinery, while relevant to a tortious interference claim, cannot be made to fit within the statutory and doctrinal constraints of the mail and wire fraud statutes.

4. The Travel Act

To make out a violation of the Travel Act, 18 U.S.C. S 1952, BCI is required to prove interstate travel or use of an interstate facility with the intent to promote unlawful activity. See United States v. Zolicoffer, 869 F.2d 771, 774 (3d Cir. 1989). "Unlawful activity" is "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C.S 1952(b)(2). Thus, BCI's Travel Act claim hinges on the success of its Hobbs Act and commercial bribery claims. Since we have determined that the jury's findings of these predicate acts must be set aside, so too must be the finding of a Travel Act violation.

D. Conclusion

Having found that the BCI did not present a sustainable case that defendants committed any of the alleged predicate acts, we must set aside the verdict that defendants violated 18 U.S.C. S 1962(c) and that they conspired to violate that section as prohibited by 18 U.S.C. S 1962(d).29

_____

28. Further, to the extent that BCI contends that U.S. Healthcare's proffered justification for the audit -- Gary's excessive use of brand name drugs -- was an overt misrepresentation, we disagree. The record shows that Gary's employees conceded that the stated reason was accurate, and that the audit revealed that Gary's was using generic drugs far less than the network average and inadequately documenting decisions not to use them. Our conclusion does not diminish BCI's claim that the audit was intended to coerce Gary's choice of TPA providers since even a "legitimate" audit may, based on timing and other circumstances, have a coercive purpose and effect.

29. Defendants have also argued that the aiding and abetting liability imposed on the three U.S. Healthcare executives cannot survive because

V. TORTIOUS INTERFERENCE

In addition to finding for BCI on its federal law claims, the jury also awarded BCI damages on the theory that defendants unlawfully and improperly interfered with BCI's existing and prospective contractual relations with Gary's. Defendants challenge this verdict on the ground that, as competitors for Gary's TPA business, they had a privilege to interfere with BCI's terminable at will contract with Gary's so long as they did not employ "wrongful means". See Restatement (Second) of Torts S 768(1)(b) (1979). Defendants contend that BCI made no legally sufficient showing of wrongfulness, and thus that the "competitors' privilege" compels entry of judgment in their favor on BCI's tortious interference claim. In the alternative, defendants argue that even if BCI presented a jury question on tortious interference, a new trial is required because of an error in the jury charge.

Pennsylvania recognizes both interference with existing contractual relations and interference with prospective contractual relations as branches of the tort of interference with contract. See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 925 (3d Cir. 1990). While the two branches of tortious interference are distinct, they share essentially the same elements. In order to prevail on a claim for intentional interference with contractual or prospective contractual relations, a plaintiff must prove:

> (1) the existence of a contractual, or prospective contractual relation between itself and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring;
>
> (3) The absence of a privilege or justification on the part of the defendant;

_____

the statutory analysis applied to securities cases by the Supreme Court in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), if applied to the RICO statute, would eliminate RICO aiding and abetting liability. In view of the dismissal of the RICO claims, that argument need not be reached.

(4) the occasioning of actual legal damage as a re sult of the defendants' conduct; and

(5) for prospective contracts, a reasonable likeli hood that the relationship would have occurred but for the interference of the defendant

Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. 1988); see also Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979); Birl v. Philadelphia Elec. Co., 167 A.2d 472, 474 (Pa. 1960).

The defendants assert that BCI failed to present sufficient evidence to satisfy the third element of its claim, which is the absence of privilege or justification on the part of the defendants. In support of this contention the defendants direct us to S 768 of the Restatement (Second) of Torts which sets forth the competitors' privilege. That section provides:

S 768. Competition as Proper or Improper Interference.

(1) One who intentionally causes a third person no t to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unla wful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another f or the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Section 768 has been recognized by Pennsylvania courts, see Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. Ct. 1988); Franklin Music Co. v. American Broadcasting Co.,

63

616 F.2d 528, 543–44 (3d Cir. 1980), which are guided by the Restatement of Torts in the area of tortious interference, see Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175 (Pa. 1978).

As a threshold matter, the parties dispute whether BCI's contract with Gary's was prospective or existing, and thus whether defendants can even seek the protection of S 768. BCI contends that, since it had an existing contract with Gary's at the time of defendants' alleged interference, defendants' status as competitors could not make the interference proper. See S 768(2). In response, defendants argue that BCI's contract with Gary's was terminable at will, and thus that the Restatement would characterize it as prospective, see Restatement (Second) of Torts S 766 cmt. g. ("an interference with [a contract terminable at will] is closely analogous to interference with prospective contractual relations."), thereby bringing defendants' behavior within the ambit of S 768(1). While the proper classification of at will contracts in tortious interference case law has been the subject of some controversy, we need not enter this debate here since S 768(1), by its terms, applies to alleged interference with either prospective contractual relations or existing contracts terminable at will. There is no question that BCI's contract with Gary's was terminable at will.30

Turning to the four elements set forth in S 768(1), the parties do not contest that elements (a) and (d) are satisfied. BCI and CHA were competitors for Gary's TPA contract, and defendants had the purpose, at least in part, of advancing their interests through their competition with BCI. We also conclude that to the extent that BCI is arguing that defendants' conduct constituted an unlawful restraint of trade within the meaning of S 768(1)(c), this contention is foreclosed by our reversal of BCI's antitrust claim and BCI's failure to show how defendants conduct violated any other federal or state statutory or common law

_____

30. BCI's contract with Gary's provided that "[e]ither party may terminate this Agreement for any reason or no reason at any time upon thirty (30) days written notice." This language clearly marks the contract as terminable at will upon proper notice.

anti-competitive prohibition. Thus, the question is whether defendants' actions were privileged business competition, which turns on whether they employed "wrongful means" of inducement in their efforts to secure Gary's TPA contract. See S 768(1)(b).

The Pennsylvania Supreme Court has yet to provide a definition of "wrongful means", and thus we turn to the Restatement for guidance. In defining what kind of means are wrongful, comment e to S 768 provides, in part, that:

> If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in S 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section.

Other courts, relying partly on this language, have interpreted the wrongful means element of S 768 to require independently actionable conduct on the part of the defendant. See, e.g. DP-Tek, Inc. v. AT&T Global Information Solutions Co., 100 F.3d 828, 833-35 (10th Cir. 1997). Under this standard, wrongful means are those that are themselves capable of forming the basis of liability for the defendant. Id. at 834 (citing Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483 (8th Cir. 1992)). The defendants contend that the Pennsylvania Supreme Court would adopt this construction of wrongful means, and that we must therefore set aside the tortious interference verdict as a matter of law since BCI has failed to identify any basis on which the defendants' conduct could be independently actionable other than the antitrust and RICO theories which we have found to be legally untenable.

The disposition of BCI's claim, however, does not require us to determine whether Pennsylvania would limit wrongful means to those that are independently actionable because the allegations of wrongful means in this case differ in one crucial aspect from those in cases such as DP-Tek. Whereas in DP-Tek the defendant was accused of using wrongful means in the market in which it and the plaintiff competed, here BCI has alleged that the defendants employed economic pressure in what we have deemed the market for

65

pharmacy customers (where BCI was not a competitor) in order to force Gary's hand in the TPA market (where BCI and CHA competed). This form of "competition" is specifically deemed wrongful by the portion of comment e which directly follows that quoted above. It reads:

> The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

S 768, cmt. e. (emphasis added)

Based on the this section of comment e, we believe that even if the Pennsylvania Supreme Court were to require independently actionable means, it would not apply that requirement in cases, such as this one, where the defendant exerted "economic pressure" or "a superior power" in a market unrelated to the competitive market. Cf. DP-Tek, 100 F.2d at 835 n.8 (citing comment e and noting that an exception to the independently actionable conduct requirement may exist "where a plaintiff proffers evidence that the defendant exerted `a superior power in affairs unrelated' to the business in which they compete."). The defendants contend that Pennsylvania, while it has adopted S 768, would ignore this portion of comment e. We disagree, since we see no reason why Pennsylvania would subscribe to the requirements of S 768, but only to selective portions of the comments explaining that section.

BCI proffered ample evidence from which a jury could conclude that U.S. Healthcare attempted to acquire Gary's

66

TPA business by threatening Gary's with withdrawal of its membership in the U.S. Healthcare provider network. BCI also adduced evidence of heavy-handed tactics by U.S. Healthcare in the market for pharmacy customers. As was discussed in the RICO section, a reasonable jury could have found that U.S. Healthcare used its quality assurance machinery not only to assure quality, but also to generate economic pressure on Gary's to switch TPA providers. While we found that this coercive misuse of the quality assurance apparatus was not cognizable as commercial bribery or mail/wire fraud, see supra, it is sufficient, based on comment e, to constitute wrongful means under Pennsylvania tortious interference law.

Defendants seek to avoid the clear application of comment e to their actions by arguing that since both comment e and federal tying/coercive reciprocal dealing jurisprudence are concerned with the extension of economic power from one market to another, the two bodies of law should be read in tandem, and thus that BCI's failure to show that the defendants possessed sufficient market power to violate the Sherman Act should preclude BCI, as a matter of law, from recovering on its tortious interference claim. Put differently, defendants assert that they could not apply "economic pressure" on Gary's in the market for pharmaceutical customers since they did not have appreciable market power, under federal law, in that market. We disagree both with the defendants' reading of comment e and with the premise that state tortious interference law and federal antitrust law should be read in pari materia.

Defendants' argument that the federal market power requirement must be grafted onto comment e is predicated on their suggestion that without such a requirement, comment e would render all reciprocal dealing/tying arrangements tortious -- even those that are pro-competitive. (Our reference to pro-competitive tying arrangements is to those that do not violate the Sherman Act.) Defendants submit that such a result would be contrary to the public policy of Pennsylvania as evidenced by the Commonwealth's failure to pass an Any Willing Provider law. According to the defendants, this failure

67

indicates that Pennsylvania favors selective contracting between HMOs and providers, and thereby approves of the conduct at issue here.

We decline to read an affirmative policy statement into a legislature's failure to pass a law; to do so would be wholly speculative. But even if defendants are correct that Pennsylvania has a policy of allowing HMOs to decide whom to admit into their networks, it would stretch this policy beyond its logical constraints to find in it tacit approval of the use of threatened exclusion from a pharmacy network to foreclose competition on the merits in an unrelated market.

Furthermore, we do not agree with defendants' reading of comment e. Rather, we read the language requiring the plaintiff to show that the defendant employed "economic pressure" and "a superior power" in the unrelated market as requiring evidence that the defendant used its economic power in that market to coerce the third party's decision in the competitive market. In order to show coercive pressure, the plaintiff must prove that the defendant exercised some market power in the unrelated market -- lest the third party simply ignore its demands. However, we see no reason why economic coercion cannot be generated by market power that, while not sufficient to violate the Sherman Act, is nonetheless not insignificant, which is the case here.31

_____

31. We reject defendants' argument that they are entitled to judgment as a matter of law since the only direct evidence that Gary's was coerced consists of hearsay testimony from three BCI employees to whom Gary's Robin Risler indicated that she was forced to fire BCI, and testimony from Sandra Chen that Gary Wolf had indicated to her that he was under pressure to entertain a bid for U.S. Healthcare's TPA service. The district court properly admitted these statements pursuant to Fed. R. Evid. 803(3), the "state of mind" exception to the hearsay rule, with the limiting instruction that the jury should not view the testimony as proof of the truth of the underlying facts asserted. Defendants contend that despite this instruction, the jury must have improperly used the testimony as substantive evidence of coercion, because there was no other evidence of coercion. We disagree with this conclusion and with the defendants' view of the evidence, since we believe that there is ample circumstantial evidence from which a jury could have reasonably inferred that Gary's was coerced. Defendants are, of course, free to argue their view of the evidence on remand.

Viewing the preceding discussion in a broader context, defendants' contention that comment e should be read to include a federal market power requirement ignores the different purposes and scopes of inquiry of the two bodies of law. In particular, it fails to recognize both the gatekeeping role that the market power requirement plays in federal tying jurisprudence and the quite different policies of state tort law. Federal antitrust law is directed at protecting competition rather than individual competitors, and outlaws only those tying/reciprocal dealing arrangements that substantially foreclose competition in the tied product market. The market power requirement of the per se antitrust jurisprudence serves this goal since it is presumed that where the defendant exercises appreciable market power in the tying product market it can leverage that power to substantially foreclose competition in the tied product market.

The use of the federal market power screen is, however, inapposite to state tortious interference law which does not predicate liability on a showing that the defendant's conduct had broad anti-competitive effects. Unlike federal antitrust law, state tortious interference law is designed to protect competitors not competition. In this regard, it bases liability for competitors, in part, on the means of competition employed and their effect on a single competitive interaction. This inquiry neither requires, nor is served by, a showing that the defendant exercised appreciable market power.

In the end, we take a fundamentally different view of BCI's tortious interference claim from that espoused by the defendants. As we noted earlier in this opinion, the crux of defendants' argument is that BCI should not be able to repackage a failed antitrust claim as tortious interference. In our view, BCI has attempted just the opposite. That is, it has taken conduct that constituted tortious interference with contractual relations and attempted to turn it into violations of federal antitrust and racketeering laws. While these attempts have been derailed on this appeal, that result does not foreclose BCI's state tort law claim.

Despite our determination that BCI adduced sufficient evidence at trial to allow a reasonable jury tofind that

69

defendants employed wrongful means and thus acted outside the scope of the competitors' privilege, we must reverse the judgment and remand the case for a new trial because of errors in the relevant jury charge. The district court instructed the jury on "wrongful means" as follows:

> It is -- wrongful means to take business away from a competitor by using economic power in matters that are unrelated to the business in which the competitors compete. Thus taking away a competitor's business by applying economic pressure in an area that is unrelated to the field in which the parties compete constitutes wrongful means.
>
> Wrongful means also include any unlawful conduct in violation of specific statutory provisions or of established public policy.
>
> To determine whether a defendant's interference was wrongful, you should consider the following factors: first, the nature of the actor's conduct; second, the actor's motive; third, the interests of the other with which the actor's conduct interferes; fourth, the interests sought to be advanced by the actor; fifth, the social interests in protecting the freedom of action of the actor and the contractual interests of the other; sixth, the proximity or remoteness of the actor's conduct to the interference and, seventh, the relations between the parties.

As set out in the proceeding discussion, the first paragraph of this instruction, which is derived from comment e to S 768, provides a proper basis on which the jury could have determined that the defendants' conduct was wrongful. However, the second paragraph, while an accurate statement of the law, necessitates a retrial because it invited the jury to import the errors in the antitrust and RICO analysis, as set out supra, into the tortious interference analysis. Indeed, based on the prominent position that BCI's antitrust claim occupied at trial, such infection almost certainly occurred. Faced with this circumstance, the proper course is for us to remand for a new trial rather than attempt to divine the basis of the jury's verdict. See Wilburn v. Maritrans GP, Inc., ___ F.3d

70

___, 1998 WL 100551, *9 (3d Cir. Mar. 10, 1998) ("Where a
jury has returned a general verdict and one theory of
liability is not sustained by the evidence or legally sound,
the verdict cannot stand because the court cannot
determine whether the jury based its verdict on an
improper ground."); Avins v. White, 627 F.2d 637, 646 (3d
Cir. 1980) (" `Where . . . a general verdict may rest on either
of two claims –– one supported by the evidence and the
other not –– a judgment thereon must be reversed.' ")
(quoting Albergo v. Reading Co., 372 F.2d 83, 86 (3d Cir.
1967)); see also McKenna v. Pacific Rail Service, 32 F.3d
820, 831–32 (3d Cir. 1994).32

BCI argues that remand is not required since defendants'
waived any objection to the jury charge. Their argument
has two bases. The first is Fed. R. Civ. P. 51 which requires
any objections to the jury charge to be made at the close of
the charge. As BCI correctly notes, no such objection was
lodged in this case. Despite this failure, we do notfind
waiver since we see no basis on which defendants could
have objected to this portion of the instruction. As noted,
the problem with the court's instruction was not that it
misstated the law, but rather that, in correctly stating the
law, it created the possibility that errors in the RICO and
antitrust verdicts would contaminate the tortious
interference verdict. Thus, it was not until our decision on
appeal that the tortious interference instructions became
erroneous. In such a situation, it would be unfair to visit

_____

32. We do not believe that any doubt is cast on the applicability of this
general rule by the fact that this case was submitted to the jury on
special interrogatories and thus, unlike the cases cited, the jury did not
render a general verdict. Our reading of the verdict sheet submitted to
the jury in this case indicates that, at least as to the tortious
interference count, the verdict rendered by the jury was the functional
equivalent of a general verdict. The sole question relating to tortious
interference liability posed to the jury was

       Do you find that the plaintiff has proven by a preponderance of the
       evidence that the following defendants intentionally interfered
with
       the plaintiff's existing or prospective contractual relations.

As this interrogatory in no way facilitates our inquiry into the basis for
the jury verdict, we find that the general rule requiring remand stated in
Wilburn and Avins governs.

the harsh consequence of waiver on the defendants. This conclusion is buttressed by the fact that defendants did object at trial to the jury instructions regarding the alleged antitrust violation.

BCI also contends that since the case was submitted to the jury on special interrogatories, defendants' failure to proffer any interrogatories requiring the jury to specify the basis on which they found defendants conduct to be wrongful resulted in a waiver by defendants of any right they had to a new trial on that basis. This contention is based on Fed. R. Civ. P. 49(a), which governs the use of special verdicts in the federal courts. Specifically, plaintiff relies on that part of Rule 49(a) which provides that if, when submitting special interrogatories to the jury, "the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury." Fed. R. Civ. P. 49(a).[33]

While, under Rule 49(a), a court may be deemed to have made a factual finding on an element of an offense that is necessary to sustain a judgment even though the jury did not specifically answer an interrogatory concerning that element, see Watkins v. Fibreboard Corp., 994 F.2d 253,

_____

33. Rule 49(a) provides:

   (a) Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

72

257–58 (5th Cir. 1993), we do not read this rule, by its terms, as applying to the situation where, as here, the defendants' objection is not based on the fact that the wrongfulness issue was not submitted to the jury, but rather that the court gave a definition of wrongful that has been rendered erroneous by our decision on this appeal.

Nor would such an application be in keeping with the purpose of that section of Rule 49(a) that allows the trial court to "fill in the gaps" of a special verdict. As noted in Watkins, this ability

> is imperative if a special verdict . . . rather than a general verdict is to continue to be employed. Otherwise there would always be the danger that the special verdict would be set aside because the jury had failed to make a particular finding whereas a general verdict could not be challenged on this ground.

994 F.2d at 258 (citing 5A Moore's Federal Practice P 49.03(4) (1993); 9a Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure S 2507 (1971)). In this case, even had the jury rendered a general verdict, we would be constrained to remand for a new trial based on errors in the charge. Thus, the need to preserve symmetry between the treatment of general and special verdicts would not be served, and would indeed be denigrated, by a finding of waiver predicated on Rule 49(a).

VI. CONCLUSION

For the foregoing reasons, the judgment of the district court will be reversed and the case remanded with instructions to grant judgment for the defendants' on BCI's antitrust and civil RICO claim, and to conduct a new trial on BCI's claim for tortious interference with contractual relations.34

_____

34. On retrial, the jury will have to consider anew whether defendants' behavior was outrageous enough to warrant an award of punitive damages under Pennsylvania law. See Takes v. Metropolitan Edison Co., 655 A.2d 138, 146 (Pa. Super. 1995) ("[P]unitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct

The parties shall bear their own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

shows either an evil motive or reckless indifference to the rights of others.") While the original jury found malice on the part of U.S. Healthcare and its executives, such a finding may not be inevitable at retrial where the jury will not be under the mistaken impression that defendants' conduct violated the Sherman Act, civil RICO, and the statutes underlying the predicate acts of the RICO count. We, of course, intimate no view on that subject.