

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1998

# United States v. Tobin

Precedential or Non-Precedential:

Docket 97-5304

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Tobin" (1998). *1998 Decisions.* Paper 202.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/202

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5304

UNITED STATES OF AMERICA

v.

KATHLEEN TOBIN
         Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Cr. No. 95-00121)

Argued on: March 10, 1998

Before: STAPLETON and ALITO, Circuit Judges, and
SHADUR, Senior District Judge*

(Opinion Filed: August 25, 1998)

        Kenneth M. Tuccillo (Argued)
        139 Southside Avenue
        Hastings, NY 10706

        Counsel for Appellant

_____

* The Honorable Milton I. Shadur, United States District Judge for the
Northern District of Illinois, sitting by designation.

          George S. Leone
          Chief of Appeals
          Allan Tananbaum (Argued)
          Assistant U.S. Attorney
          Office of United States Attorney
          970 Broad Street
          Room 502
          Newark, NJ 07102

          Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

Kathleen Tobin appeals her conviction and sentence in a criminal case. She argues that the district court erroneously denied her request for a "claim-of-right" jury instruction regarding an alleged violation of the Hobbs Act, 18 U.S.C. S 1951. She also claims that the indictment should have been dismissed pursuant to the Speedy Trial Act, 18 U.S.C. S 3161(c)(1), that the district court erred in admitting certain tape recordings, that her trial counsel was ineffective, and that she was sentenced under the wrong provision of the Sentencing Guidelines. For the reasons discussed below, we affirm Tobin's conviction and sentence.

I.

Tobin was charged in a 14-count indictment with one count of interfering with interstate commerce by extortion and threatened physical violence, in violation of the Hobbs Act, 18 U.S.C. S 1951; three counts of making interstate telephone calls threatening to injure the person of another, in violation of 18 U.S.C. S 875(c); two counts of making threatening interstate telephone calls with the intent of extorting a thing of value from another person, in violation of 18 U.S.C. S 875(d); seven counts of trafficking in and using unauthorized telephone calling cards with the intent to defraud and thereby obtaining services valued in excess

2

of $1000 within a one-year period, in violation of 18 U.S.C. S 1029(a)(2); and one count of possessing 15 or more unauthorized calling cards with the intent to defraud, in violation of 18 U.S.C. S 1029(a)(3). She was tried before a jury and was convicted on all counts except those charging the making of interstate telephone calls that threatened to injure the person of another.

The facts in this case, when properly viewed in the government's favor in light of Tobin's conviction by the jury, are relatively simple. William Cirignano was the leader of a New Jersey-based rock band named "Monroe." The band never had a business manager, and therefore Cirignano generally booked the band's "gigs" himself. In August or September of 1993, Tobin contacted Cirignano and sought to be hired as Monroe's booking agent. Tobin claimed to have contacts with clubs outside of the New York/New Jersey area in which Monroe usually performed.

Cirignano was initially receptive to Tobin's approach, but after two meetings he changed his mind. The second meeting took place at a club at which Tobin claimed to be hosting a birthday party. Tobin had claimed that Cirignano could meet the different bands that she represented, but none of the musicians at the club knew Tobin. When Cirignano introduced Tobin to Rick Seymour, Monroe's bass player, Tobin claimed that she was already representing Monroe and that she had lined up many shows for the band. Cirignano and Seymour felt uncomfortable with the situation and wanted to leave. Tobin demanded that Cirignano drive her home from the club, and when he refused, she became angry. Cirignano and Seymour then slipped away behind Tobin's back.

Tobin immediately commenced a protracted campaign of telephone harassment. Soon after Cirignano left the club, she paged him about 12 times. His answering machine on his home telephone line had messages that were vulgar and intimidating. One message threatened: "I have your [expletive deleted] for a year. I own you. I will do whatever I want with you." Tobin also stated: "You don't know who you are [expletive deleted] with. And I own you . . . . . I put too much time and effort into your band." These telephone

3

calls continued at all hours of the day and night for several months without respite.

Moreover, Tobin went far beyond vulgarity and annoyance and included extortionate threats in her messages. She threatened that she would file suit against Cirignano and would assert that he filed false charges against her, exposed himself to her, and demanded sex. She also threatened to report to the Internal Revenue Service that he was not declaring income that he earned in his business of chauffeuring women who worked in"go-go" bars.

Tobin also started a campaign of harassment against Cirignano's family and friends. Cirignano lived with his parents, and there were three separate telephone lines in the house. Tobin called all three lines dozens of times a day, and she also called Cirignano's uncles in Minnesota and Texas. She claimed to have information about the Cirignano family's credit history and their property interests. Cirignano's family changed all three numbers repeatedly, but Tobin always obtained the new numbers even though they were unlisted.[1]

Tobin also telephoned Jodi Kaplan, Cirignano's girlfriend. In her first week of calling, Tobin called Kaplan ten times a day. Tobin told Kaplan that Cirignano was a crack cocaine dealer and that the police had Kaplan's house under surveillance. Tobin also claimed that Kaplan was liable as an accomplice for what she claimed was Cirignano's harassment of Tobin, and Tobin said that she had notified the Federal Bureau of Investigation about Kaplan's role in the affair. Tobin threatened to sue Kaplan and Cirignano for federal civil rights violations. In addition, Tobin left anti-Semitic slurs on Kaplan's answering machine and taunted Kaplan about Kaplan's father's terminal illness.

Tobin also threatened Cirignano with physical violence. Tobin left messages for Cirignano intimating that he should

_____

1. Tobin obtained these numbers by calling the telephone company and posing as an employee in the repair department or as an anxious parent seeking the new number. Bell Atlantic traced these calls to Tobin's residence in Queens.

get bodyguards and claiming that she was somehow connected to an outlaw biker gang that would kill him. She declared: "I am coming to find you," and she said that Cirignano would wind up "hanging from a [expletive deleted] tree."

Of particular relevance to this appeal are Tobin's threats to destroy the band. Tobin claimed that she had listed herself as Monroe's representative and that when clubs called to book gigs, she was going to tell them that the band was "over" and "non-existent." Tobin faxed a letter that said that "Monroe sucks and Billy [Cirignano] is a five-foot-four-inch troll, tattooed 35-year-old lo[ ]ser. Monroe is dead." Tobin also followed through on her threats by terrorizing a club promoter so that he dropped Monroe from a billing that had previously been arranged by the band. On another occasion, Tobin told Cirignano that she would have him arrested if he and the band played at a particular club. As a result, Monroe canceled that performance. Tobin had also threatened the club owner, who independently told Cirignano that it would not have been advisable for the band to play that gig.[2]

Tobin was arrested on March 23, 1995. Her jury trial commenced on September 3, 1996, and on September 20, 1996, the jury convicted her of all charges except making interstate telephone calls that threatened to injure the person of another, in violation of 18 U.S.C. S 875(c). On April 30, 1997, she was sentenced to a 46 month term of imprisonment, to be followed by three years of supervised release. This appeal followed.

II.

A. Tobin's first argument is that the district court erred in denying her request for a "claim-of-right" jury

_____

2. Tobin also obtained numerous fraudulent calling card accounts in other people's names, including Cirignano's. This was the basis of the seven counts of trafficking in and using unauthorized telephone calling cards and the one count of possessing 15 or more unauthorized calling cards with the intent to defraud. No issues have been raised in this appeal regarding these charges.

5

instruction. The claim-of-right defense to a Hobbs Act violation requires that the government prove that the defendant did not have a legitimate claim to the thing of value that is the subject of the alleged extortionate act and that the defendant knew that he or she did not have such a claim. See, e.g., United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989) ("for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim-of-right to that property"). The defense is derived from the Supreme Court's decision in United States v. Enmons, 410 U.S. 396 (1973), in which the Court held that threats and violence that occurred during the course of a labor strike were not covered by the Hobbs Act because the striking workers had a legitimate right to the things of value that they ultimately received. The Court relied in part on legislative history that pointed to the exclusion of labor violence from the purview of the Hobbs Act.

This circuit, as well as many others, originally limited the claim-of-right defense to the particular context in which it was decided, namely, labor-management conflicts. See United States v. Agnes, 753 F.2d 293, 297-99 (3d Cir. 1984) (limiting Enmons to "create a claim-of-right defense only in those situations in which the use of force is expressly identified by Congress as being outside the purview of the Hobbs Act"); United States v. Cerilli, 603 F.2d 415 (3d Cir. 1979) (no claim of right defense outside of the labor violence context). Recently, however, this court adopted the reasoning of the First Circuit's Sturm decision and held that the claim-of-right defense applies to non-labor cases, so long as the threats involved are purely economic. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494 (3d Cir. 1998). The court held that, in a case in which the alleged perpetrator makes purely economic threats, there is no violation of the Hobbs Act unless the victim had a preexisting right to be free of the economic fear that the defendant utilized. Id. at 526.

As an example of a case in which the claim-of-right defense applies, the Brokerage Concepts panel cited Viacom Int'l v. Icahn, 747 F. Supp. 205 (S.D.N.Y. 1990) aff'd on other grounds, 946 F.2d 998 (2d Cir. 1991). See Brokerage

6

Concepts, 140 F.3d at 524-25. In Viacom, a corporate raider engaged in what is referred to as "greenmail," i.e., the raider amassed Viacom stock and threatened a corporate takeover unless the company purchased his stock at a premium over the market price. The Viacom court held that this threat did not constitute a violation of the Hobbs Act because Viacom did not have a preexisting right to be free from the threat of a takeover. 747 F. Supp. at 213.

Tobin argues that, under the caselaw cited above, she was entitled to a jury instruction about the claim-of-right defense. She is in error. The caselaw focuses on whether the victim of the extortionate activity had a preexisting right to be free from the threats invoked, and here Tobin's victims plainly possessed such a right. Tobin's actions went far beyond the hard bargaining tactics utilized in Brokerage Concepts and Viacom. Tobin did not threaten to pursue legal action to enforce the oral contract that she claimed existed. Rather, she threatened unrelated lawsuits alleging sexual harassment; she circulated flyers proclaiming that "Monroe is dead;" and she threatened Cirignano that

> Club owners are not booking you in New York City . . . . Nobody wants you. You're washed up. You'll see what happens when all these directories come out and you're listed under my company name, and I get calls, you're finished. You're history, the band's over. That's exactly what I'll tell them. All the fan mail that I get, goes right back, telling them, the band is non-existent.

App. at 2399.

Moreover, Cirignano and his associates certainly had the right to be free from Tobin's campaign of telephone harassment. As previously noted, Tobin made innumerable telephone calls to Cirignano's pager and home telephone, as well as to his parents, his girlfriend, and others. No matter how often these individuals changed their telephone numbers and requested that they be kept unlisted, Tobin obtained those numbers and began the harassment anew. Tobin's actions -- unlike those in Brokerage Concepts and Viacom -- are certainly within the purview of the Hobbs Act.

7

In view of the evidence regarding Tobin's conduct, the district judge did not err in refusing to give a claim-of-right instruction to the jury. It was entirely appropriate for the district court to decide that the evidence precluded the instruction as a matter of law. In Sturm, 870 F.2d at 773, the court found as a matter of law that the claim of right instruction was inapplicable because a debtor did not have the right to charge a creditor for locating collateral.3 In the present case, Tobin did not have the right to seek to enforce her alleged oral contract through a campaign of telephone terrorism. The claim of right instruction was clearly unwarranted, and the district court did not err in refusing to instruct the jury on the defense.4

B. Tobin's next argument is that the district court erred in refusing to dismiss the indictment under the Speedy Trial Act, 18 U.S.C. S 3161(c)(1), because more than 70 non-excludable days elapsed from the date of her indictment on March 14, 1995, to the commencement of her trial on September 3, 1996. Specifically, Tobin argues that 21 days elapsed from March 24, 1995, through April 27, 1995, and that 54 days elapsed from December 7, 1995, through January 31, 1996, for a total of 75 days. She further points to eight days that elapsed from June 24, 1996, through July 3, 1996. The government concedes that these last eight days were non-excludable.

_____

3. In Sturm, the victim was the creditor of the defendant and had repossessed the defendant's airplane. The defendant sought to seek a fee from the creditor for locating the airplane's logbooks.

4. Tobin also argues that the district court erred in not repeating the definition of "knowing and wilfully" each time the district court discussed the Hobbs Act counts. Tobin does not contest that the district court properly instructed the jury as to the definition of the terms. Since Tobin did not object to the charge at trial, this issue is reviewed only for plain error. See Fed. R. Crim. P. 52(b).

Given that the mens rea elements of "knowing and wilfully" applied to several offenses within the jury charge, it was not necessary for the court to define the terms each time they appeared. See United States v. Lake, No. 97-7462, slip op. at 10-11 (3d Cir. 1998); United States v. Sokolow, 91 F.3d 396, 409-10 (3d Cir. 1996) (where district court properly defined scienter, it was not plain error not to repeat the definition each time the issue arose).

The government argues that Tobin's argument fails because the time period from January 11, 1996, through January 31, 1996, was excludable in its entirety. [5] Working backwards from January 31, 1996, the government maintains that January 31 is excludable because Tobin filed motions on that day, thereby stopping the clock. 18 U.S.C. S 3161(h)(1)(F). The period between January 24, 1996, and January 30, 1996, is excludable, the government contends, because Tobin's attorney met with Pretrial Services on January 24 and discussed Tobin's refusal to comply with the magistrate judge's order to undergo a mental evaluation. (The magistrate judge had ordered the evaluation on March 25, 1995.) Because Tobin refused to comply with the earlier order, the district court ordered a competency hearing on January 25, 1996. At that hearing, the government argued that Tobin was in flagrant violation of the order to undergo psychiatric evaluation. The government contends that its argument at the hearing was the functional equivalent of a motion and thereby stopped the clock from January 25, 1996, through January 31, 1996, while the motion was pending.

The time period from January 11, 1996, through January 24, 1996, is excludable, the government argues, because Tobin's counsel told Pretrial Services and the government that Tobin's petition for a writ of certiorari challenging the magistrate judge's order regarding the psychiatric evaluation order had been denied. The government argues that she should have immediately submitted to the evaluation, but she did not do so. Rather, her attorney asked for two weeks so that he could make arrangements for Tobin to be evaluated and could try to convince her to comply. The government argues that this time period should be excluded because the delay was due solely to Tobin's intransigence and not to any fault on the

_____

5. Tobin argues that the government waived this argument by not presenting it in the government's briefs below. This is incorrect. The government clearly raised this argument to the district court and the court accepted this argument in denying Tobin's Speedy Trial motion. App. at 560-62. In any event, because our affirmance of the decision below can be premised on any legitimate ground, even one not advanced below, Tobin's waiver argument fails.

government's part. Cf. United States v. Bey, 499 F.2d 194 (3d Cir. 1974) (in Sixth Amendment speedy trial context, time caused by defendant's failure to submit to court-ordered psychiatric examination was excludable from the analysis). The government contends that because the time period from January 11, 1996, through January 31, 1996, was excludable in its entirety, only 35 days elapsed from December 7, 1995, through January 10, 1996. This results in a total of 64 non-excludable days before trial.

The government's arguments are persuasive. Although there was never a formal motion, the government did, in effect, move to have Tobin comply with the competency evaluation that had been ordered in March of 1995. Moreover, since the order had been in effect for more than ten months and Tobin had yet to comply, it is unreasonable to include the two-week delay that had been requested by Tobin's counsel in order to convince her to comply with a court order that had been challenged without success in the Supreme Court. Although Bey, supra, involved a speedy trial claim under the Sixth Amendment, rather than the Speedy Trial Act, we nevertheless find Bey's reasoning to be apposite and persuasive. A defendant's unwillingness to comply with a valid competency examination order should not be counted against the government. Since only 35 days should be included, along with the eight- and 21- day periods that the government concedes, only 64 days elapsed. As a result, the district court did not err in refusing to dismiss the indictment on Speedy Trial Act grounds.

C. Tobin next argues that the district court erred in admitting into evidence various audio tapes that had purportedly come from William Cirignano's telephone answering machine and contained threatening messages from Tobin. The government laid a foundation for the admission of the tapes through Cirignano, and defense counsel requested the opportunity to voir dire Cirignano about how the tapes had been made. During the voir dire, Cirignano denied having edited the tapes. After voir dire, defense counsel stated that he had no further questions, and the tapes were received into evidence.

10

After the government had rested, Tobin called an expert witness who testified that one of the messages on one of the 13 tapes had been edited, contrary to Cirignano's testimony. The expert explained that the tape could not have been made on an answering machine, as Cirignano testified, since the tape was in stereo and answering machines are monaural. Moreover, the expert pointed to breaks in the sound that were visible on the tape itself after application of magnetic developing fluid. After the expert testified, defense counsel did not object to the prior admission of the tape at issue. Rather, he argued during summation that Cirignano had lied about the making of the tapes and was therefore an incredible witness.

In considering Tobin's argument regarding the admission of the tape, we must first decide what standard of review to apply. Tobin argues that our review is plenary, while the government argues that we should not consider the issue at all, since Tobin's attorney affirmatively waived the issue at trial. It is not entirely clear from the record that Tobin's attorney affirmatively waived the issue. We will not exercise plenary review, however, because Tobin did not object to the admission of the tapes. Because there was no objection, we will limit our review to plain error.

Tobin's evidentiary argument fails to meet the plain error standard because it is clear that, even if the district court erred in admitting the suspect tape, this error did not affect substantial rights. See Fed. R. Crim. P. 52(b). Indeed, the error, if any, was harmless. The court received into evidence 13 tapes containing 131 messages. Even if the one questionable tape had been excluded, there remained 126 messages, including 95 from Cirignano's answering machine. Even if the district court erred in admitting the altered message, or even the entire tape, there were still so many other messages that inculpated Tobin that the error was harmless. Moreover, an unaltered version of the message that the expert had claimed had been edited was present on one of the other tapes that had been admitted into evidence.6 Finally, any attack on the authenticity of the

_____

6. Tobin has no specific basis to attack the tape containing the unaltered or "long" version of the message at issue. Her expert testified, regarding this latter tape, that "I didn't authenticate that particular tape, but in listening I found [it] to be true [that the message was an answering machine message that was received and recorded in its entirety]." App. at 1463.

11

one tape should not spill over onto the other tapes, since there was no evidence that there were any problems with the other tapes. See United States v. Haldeman, 559 F.2d 31, 109 (D.C. Cir. 1976) (18 1/2 minute gap on one tape "hardly shows that other tapes, on which no erasures were present, were not authentic").

D. Tobin's last claim regarding her trial is that she was afforded ineffective assistance of counsel. However, claims of ineffective assistance of counsel are ordinarily not cognizable on direct appeal. United States v. DeRewal, 10 F.3d 100, 103 (3d Cir. 1993). The proper mechanism for challenging the efficacy of counsel is through a motion pursuant to 28 U.S.C. S 2255. We therefore decline to address this issue.

E. Tobin's final claim is that the district court erred in applying U.S.S.G. S 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) instead of S 2B3.3 (Blackmail and Similar Forms of Extortion).7 We hold, however, that the district court properly applied S 2B3.2 to Tobin's conduct.

The commentary to S 2B3.2 states that:

> This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as"pay up or else," or a threat to cause labor problems, ordinarily should be treated under this section.

U.S.S.G. S 2B3.2, Application Note 2 (1995 ed.) (emphasis added). Tobin contends that S 2B3.2 does not apply since Monroe was not an economically viable entity, in that the band played only six to ten gigs a year and barely broke even on those gigs it did play.

_____

7. The Base Offense Level under S 2B3.2 is 18; the Base Offense Level under S 2B3.3 is 9.

12

Tobin cites United States v. Inigo, 925 F.2d 641 (3d Cir. 1991), for the proposition that in order for S 2B3.2 to apply, the threat to the viability of the entity must be of tremendous economic magnitude in absolute terms. In Inigo, a group of textile workers attempted to extort $10 million from E.I. Dupont de Nemours and Company, Inc., ("Dupont"), threatening that they would compete with Dupont in Spandex manufacturing using trade secrets stolen from the company. This court held that U.S.S.G. S 2B3.2 did not apply to this conduct because it did not threaten the existence of the victim. Tobin interprets Inigo to mean that a threat that is of lesser magnitude in absolute terms than that in Inigo will not trigger S 2B3.2. We reject Tobin's interpretation of Inigo. We understand Inigo to mean that the threat that the defendants would compete with a multi-billion dollar corporation in one of its manufacturing areas if they were not given $10 million was not a threat to drive that enterprise out of business. Clearly, if the victim had been a "mom-and-pop" proprietorship with revenues of $1 million and a single line of business, a threat such as the one in Inigo coupled with a demand for $10 million would have been sufficient to trigger S 2B3.2.

The Sixth Circuit's decision in United States v. Williams, 952 F.2d 1504 (6th Cir. 1991), lends support to the district court's application of S 2B3.2. In Williams, defendants threatened the victims with voting to block a rezoning proposal if the local sheriff was not bribed. Indeed, defendants told the developers that their project was "dead" if they did not provide a consulting fee of $250,000. Although the amount requested was far less than the $10 million demanded by the defendants in Inigo, and the amount the victims were at risk of losing was only a few million dollars, the Sixth Circuit held that S 2B3.2 applied.

In sum, in determining whether S 2B3.2 should be applied, the focus is on the economic effect on the particular victim, not the absolute magnitude of the threat. Here, Tobin's actions threatened the viability of the band. If she had carried out the destructive course of action that she threatened (and indeed, implemented to a certain extent), the band would have faced the reasonable

13

probability of its demise.8 The district court thus properly applied U.S.S.G. S 2B3.2 to Tobin's conduct.

III.

We have considered all of Tobin's claims and find them to be without merit. For the reasons discussed above, we affirm the judgment of conviction and sentence imposed by the district court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

8. We note also that the Sentencing Guidelines do not limit S 2B3.2 to "profit-generating enterprises." There is nothing in the language of the Guideline or the commentary to suggest that the provision is limited in the way Tobin suggests.

14