**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-3693
_____

CARE ONE MANAGEMENT LLC, ET AL.
Appellants

v.

UNITED HEALTHCARE WORKERS EAST, ET AL.

_____

On Appeal from the United States District Court
for the District of New Jersey
No. 2:12-cv-06371
District Judge: Honorable Susan D. Wigenton
_____

Argued: September 24, 2020

_____

Before: McKEE, JORDAN, and RENDELL, *Circuit Judges*.

(Opinion filed: July 28, 2022)

Rosemary Alito **[Argued]**
George P. Barbatsuly
K&L Gates
One Newark Center
10th Floor
Newark, NJ 07102

Michael D. Critchley
Chritchley Kinum & Luria
75 Livingston Avenue
3rd Floor
Roseland, NJ 07068
        *Counsel for Plaintiffs-Appellants*

A. Matthew Boxer
Lowenstein Sandler
One Lowenstein Drive
Roseland, NJ 07068

Leon Dayan **[Argued]**
Jacob Karabell
Caitlin D. Kekacs
Joshua A. Segal
Bredhoff & Kaiser
805 15th Street, N.W.
Suite 1000
Washington, DC 20005

David M. Slutsky
Levy Ratner
80 Eighth Avenue
8th Floor
New York, NY 10011
        *Counsel for Defendants-Appellees*

———————————

OPINION

———————————

McKee, *Circuit Judge.*

The Racketeer Influenced and Corrupt Organizations Act (RICO)[1] authorizes private civil causes of action for acting as an "enterprise" and conducting a "pattern of racketeering activity" through certain criminal predicate acts.[2] These predicate acts include federal crimes such as mail and wire fraud, and certain state crimes, including extortion.[3] This case concerns civil RICO liability predicated on federal mail and wire fraud, as well as state law extortion through acts of sabotage and fear of economic loss. For the reasons that follow, we conclude that the District Court erred in deciding that this record could not support a finding that the Unions authorized or ratified conduct that could constitute extortion or that they wrongfully exploited threats of economic harm. We will affirm the District Court's grant of summary judgment in favor of the Unions on the remaining claims of RICO liability and remand for further proceedings consistent with this opinion.

## I. Factual Background

Plaintiffs-Appellants Care One Management LLC, HealthBridge Management LLC ("HealthBridge"), the Care

———————————

[1] 18 U.S.C. § 1961 *et seq.*
[2] *Id.* §§ 1962(c), 1964(c).
[3] *Id.* § 1961(1)(A), (B).

3

One Facilities,[4] and the HealthBridge Facilities[5] (collectively, "Care One") manage nursing homes and assisted-living

[4] Care One manages 21 facilities located throughout the State of New Jersey including the following: Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany-Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; Care One at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township; 301 Union Street, LLC, d/b/a Care One at Wellington; and 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne; the Rehabilitation Center at Raritan Bay Medical Center, LLC d/b/a Care One at Raritan Bay Medical Center; Care One at Trinitas, LLC, d/b/a LTACH – CareOne at Trinitas Regional Medical Center; and Care One at Harmony Village, LLC, d/b/a CareOne Harmony Village at Moorestown (collectively referred to herein as the "Care One Facilities"). *Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2019 WL 5541410, at *1 n.1 (D.N.J. Oct. 28, 2019).

[5] The HealthBridge Facilities include the following: 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care

Center; 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center; 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center; 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center; 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton; 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center; 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation Center; and DES Senior Care Holdings LLC, d/b/a Sweet Brook Care Centers (collectively referred to herein as the "HealthBridge Facilities"). *Id.* at *1 n.2.

facilities throughout the Northeast. Defendants-Appellees are United Healthcare Workers East SEIU 1199 ("UHWE"), New England Health Care Employees Union District 1199 ("NEHCEU"), and the Service Employees International Union ("SEIU") (collectively, "Unions"). The Unions represented several employees at various Care One facilities. This suit is the culmination of a history of conflict and animosity that has unfortunately characterized the relationship between Care One and the Unions.

In 2010 and 2011, the Unions filed charges against Care One with the National Labor Relations Board.[6] They alleged that Care One had improperly terminated or threatened employees, improperly ended benefits, and wrongfully suppressed union communications at the Connecticut facilities.[7] They also alleged that Care One had engaged in unfair labor practices during and after a union election in the Somerset, New Jersey facility.[8] The NLRB responded with complaints and hearing notices charging Care One with interfering with rights guaranteed by the National Labor Relations Act, including the refusal to bargain collectively and in good faith.[9]

Beginning in January 2011, while the NLRB complaints were pending, NEHCEU and Care One attempted to negotiate a renewal of the Connecticut facilities' collective bargaining agreements.[10] Those negotiations were not fruitful, and NEHCEU called a strike at those facilities. The night before the strike was to begin, the Connecticut facilities were vandalized and sabotaged.[11] Patient identifying information (including patient wrist bands, door name plates, and dietary requirement documents) were mixed up.[12] Medical records were altered, medical equipment was damaged or hidden, and laundry equipment was vandalized.[13] At Care One's request, the Connecticut State's Attorney investigated, but the investigation yielded neither suspects nor charges.

---

[6] *Id.* at *2.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at *3.

[11] *Id.*

[12] *Id.*

[13] *Id.*

6

Union documents later obtained in discovery revealed the Unions' plans to inspire workers to "become angry about their working conditions"[14] and to resort to "more militant" levels of activity.[15] The president of NEHCEU had also made a speech to workers in which he told them that "the law takes too long" and that NEHCEU "could be destroyed by the time the law was able to stop [Care One's] behavior."[16] After the incidents, NEHCEU's Communications Director, Deborah Chernoff, wrote to fellow employees, referring to the allegations of vandalism and destruction. The communication included the statement: "Of course anyone with a peasized brain would realize this isn't a tactic we would undertake."[17] When a reporter asked the NEHCEU about the vandalism and destruction at the Care One facilities, Chernoff wrote:

> The allegations made by HealthBridge, if true, are very serious indeed. Should evidence be found that anyone took any action that would compromise care or put residents at risk, that person or persons should be held fully accountable, no matter who they might be.[18]

The record also contains several emails sent after the incident. They include an email from Chernoff, which describes a response to a FOIA request the Unions made to the Connecticut Department of Public Health as "mudd[ying] the waters and support[ing] the contention of the workers that" patients may have removed their identifying bracelets themselves rather than saboteurs.[19] There is also an email from Chernoff to Chas Walker, Elected Organizer of UHWE, and others in SEIU. It was sent after the vandalism and sabotage. That email appears to respond to Walker's suggestion that the Unions launch their own investigation or actively seek to participate in the police investigation. In the email, Chernoff

---

[14] JA 5852, a facilitator teaching document with the goal of "answer[ing] tough questions and redirect[ing] conversations to an organizing agenda."

[15] JA 5849, a supervisor's evaluation form for an individual organizer.

[16] Defs.' Summ. J. Reply at 5.

[17] JA 6825.

[18] JA 1068.

[19] JA 5842.

suggested it would be "a very bad idea" to seek to participate in the police investigation because the Unions should not "suggest [they] have information [they] don't have."[20] The email also stressed the Unions' obligation to their members, "even when they are totally in the wrong."[21]

In addition, in 2011, with help from NEHCEU and UHWE, SEIU launched a campaign attacking Care One's labor and business practices. The campaign materials included developing websites, print and radio advertisements, as well as flyers questioning Care One's billing practices and standards of care. The campaign also publicized the NLRB complaints.[22] The union advertisements Care One focuses on before us included several rhetorical questions. The first asks: "Are HealthBridge Nursing Homes Employing Enough Caregivers For Our Loved Ones?" It asserts Care One provided below-average coverage by certified nursing assistants.[23] The second asks: "Is HealthBridge Giving Your Loved One Anti-Psychotic Drugs?" and asserts that Care One excessively administered medications.[24] The third asks: "Overbilled at a HealthBridge Nursing Home?" and references overbilling.[25] The fourth asks: "Who's in Charge at HealthBridge Nursing Homes?" and states that the facilities have an unhealthy level of turnover.[26]

The Unions submitted evidence to the District Court to show that this publicity campaign was subject to fact-checking and vetting procedures. But Care One alleges no such safeguards were actually in place. Despite Care One's allegations to the contrary, Amy Gladstein, UHWE's Assistant for Strategic Organizing, testified that the Unions had adopted certain protocols requiring researchers to be trained in conducting careful research. She also claimed that the advertisements were based on initial fact-gathering. According to her colleague, David Bates, the ads had to be "vetted by the research department for accuracy,"[27] and many

---

[20] JA 5831.

[21] *Id.*

[22] *Care One*, 2019 WL 5541410, at *3.

[23] JA 2491.

[24] JA 2501.

[25] JA 2477.

[26] JA 2494.

[27] JA 2761.

testified that the advertisements were fact-checked by trusted researchers and outside counsel.[28]

From July through November 2011, the UHWE also filed petitions for public hearings on applications for "determinations of need," which Care One had filed with the Massachusetts Department of Public Health. Care One had filed the applications to obtain approval for capital improvement projects at their facilities.[29] The Unions' objections delayed approval of Care One's applications. At one hearing, occurring almost a year after Care One filed its application, two Union members opposed the renovations, "alleg[ing] that they had been wrongfully dismissed from their longstanding jobs because of their support for the formation of a union at the nursing home."[30] The opposition was obviously unrelated to the nature of the hearing, and the regulator concluded as much.[31] During a deposition, a Union official acknowledged that their opposition "was for an objective other than blocking the repairs."[32]

In February 2012, the Unions also asked Senator Richard Blumenthal, a U.S. senator from Connecticut, to investigate Care One's allegedly questionable billing practices. Senator Blumenthal responded by asking the Secretary of the U.S. Department of Health and Human Services to audit Care One's billing practices and to investigate and pursue any enforcement actions deemed necessary. The Unions then made sure that a copy of the Senator's letter was delivered to Care One.

The Unions' campaign also involved demonstrations, including one held in August 2012 at Care One's offices where petitions for fair collective bargaining were delivered. The

---

[28] *See* JA 5327 (fact checking was "Megan [Thorsfeldt's] job and I trust her"); JA 2642 (vetting was conducted on the research side and legal side); JA 5134 (accuracy was the responsibility of "our research team" and "counsel"); JA 3718 (Gladstein explaining that "my researchers" were responsible for accuracy).

[29] JA 1480–84.

[30] JA 2557.

[31] *See id.* ("Staff did not find these comments to be pertinent to . . . [the government's] regulatory authority in its review of this application.").

[32] JA 3382.

Unions also staged a peaceful protest at NYU Law School where demonstrators handed out materials questioning Care One's owner and CEO Daniel Straus's purported hypocrisy for endowing the Institute for the Advanced Study of Law & Justice at NYU while allegedly violating labor law. The Unions also targeted unrelated business ventures of Straus, "block[ing] the development of a condominium project in which . . . Straus had invested" and "purchasing radio advertisements in Puerto Rico to disparage two unrelated businesses . . . Straus owned there."[33]

## II. Procedural Background

Care One sued the Unions for damages arising from these actions. Care One alleged they constituted a pattern of racketeering in violation of RICO. Among other characterizations, Care One alleged the Unions' actions were extortionate. The District Court granted the Unions' motion for summary judgment and dismissed the complaint. The Court held that no reasonable juror could conclude that the vandalism underlying Care One's claims could be attributed to union members, much less the Unions themselves.[34] It also concluded that other actions the Unions undertook to exert pressure on Care One—including the advertisements, picketing, and attempts to invoke regulatory and legal processes—were not extortionate. The Court also found that Defendants lacked the specific intent to deceive and were therefore entitled to summary judgment on the mail and wire fraud claims.[35] This appeal followed.

## III. Discussion[36]

---

[33] Appellant Br. at 34.

[34] *Care One*, 2019 WL 5541410, at *6.

[35] *Id.* at *7–10.

[36] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1367. We have jurisdiction pursuant to *id.* § 1291. We review a grant of summary judgment *de novo*. *Tundo v. Cnty. of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019). A district court properly grants summary judgment if the moving party shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 286–87 (citing Fed. R. Civ. P. 56(a)). We view the facts "in the light most favorable to the non-moving party and [draw] all reasonable inferences in that

RICO imposes criminal and civil liability upon those who engage in certain "prohibited activities."[37] It provides civil remedies for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."[38] To establish liability under § 1962(c), a plaintiff must show that defendant(s) acted as an "enterprise" and conducted a "pattern of racketeering activity" through certain criminal predicate acts.[39] As noted earlier, these acts may include federal crimes such as extortion, mail fraud, and wire fraud, or certain state crimes, including extortion.[40] Care One argues that the District Court erred in granting the Unions' motion for summary judgment because the undisputed facts are sufficient to allow a jury to conclude that the Unions committed the following predicate acts for RICO liability: (1) mail and wire fraud, and (2) extortion under state law through both sabotage and fear of economic loss. We begin our analysis by discussing Care One's reliance on mail and wire fraud.

### 1. Mail and Wire Fraud

Care One's claims of mail and wire fraud are based on the allegedly false and misleading advertisements mentioned above. The District Court granted summary judgment to the Unions on those claims because it found proof of the requisite element of specific intent to defraud lacking.[41] It concluded that the record did not support a finding of specific intent to deceive because the Unions had fact-checking and vetting procedures in place, and the people who researched, drafted, and approved the publications believed the advertisements to be truthful.[42] Care One argues that there were material disputes of fact as to whether such procedures existed or whether the

---

party's favor." *Id.* at 287 (alteration in original) (citations omitted).

[37] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989) (citing 18 U.S.C. §§ 1961–68).

[38] *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (alterations in original) (citing 18 U.S.C. § 1964(c)).

[39] 18 U.S.C. § 1962(c).

[40] *Id.* § 1961(1)(A), (B). Here, it is not disputed that a labor union can constitute a RICO enterprise if its affairs are conducted through a pattern of racketeering activity. *See United States v. Parise*, 159 F.3d 790, 795 (3d Cir. 1998).

[41] *Care One*, 2019 WL 5541410, at *10.

[42] *Id.*

11

procedures were followed if they did exist. Care One also claims the District Court should have looked beyond the fact-checking procedures to determine whether the Unions' statements contained half-truths or concealed material facts. We review each argument in turn.

## a.       Unions' Fact-Checking Process

First, we turn to Care One's argument that there were material disputes of fact as to whether fact-checking procedures existed and whether the procedures were followed if they did exist. After reviewing the affidavits that both sides submitted for the summary judgment motions, we hold that the trial court did not err. Care One argues that UHWE Assistant for Strategic Organizing Amy Gladstein's deposition establishes that the Unions lacked effective vetting procedures. That is a misreading of the record. Gladstein merely denied that union protocols were as strict as in "a laboratory."[43] But she emphasized that union researchers were trained to conduct careful research and that the advertisements were based on initial fact gathering.[44]

Care One also contends that a union employee admitted that communications were published without prior approval. But that employee merely specified that the procedure did not require him to sign-off on the ads. He nevertheless reaffirmed that the work had to be "vetted by the research department for accuracy."[45] Care One points to a communications employee who admitted that, when she was promoted to a senior position, she could send out certain things without her supervisor's "review," though there were categories of things that still required such approval.[46] None of this contradicts the process the Unions outlined. That process included fact-checking and vetting communications and not releasing anything without the approval of an officer or senior staff employee with authority to approve them.[47] Care One can point to specific officers or senior staff who did not do any fact-checking, but that does not negate the evidence that certain researchers and outside

---

[43] JA 3718–19.
[44] JA 7994.
[45] JA 2761.
[46] JA 5308.
[47] JA 7994.

counsel did fact-check.[48] There is information in the record, for example, that fact-checking was "Megan [Thorsfeldt's] job."[49]

We have previously affirmed summary judgment dismissal of a defamation claim where defendants filed uncontradicted affidavits that "averred that they were convinced of the truthfulness" of their statements.[50] Here, the Unions' affidavits provide sufficient evidence that the affiants believed that all the material in the advertisements was truthful and accurate. None of the portions of the record Care One relies on raises a genuine issue of disputed fact sufficient to defeat the Unions' motion for summary judgment.

**b.    Reckless Disregard**

Care One claims the District Court should have looked beyond the fact-checking procedures because fraud "may be effected by deceitful statements of half-truths or the concealment of material facts" even if the text is true.[51] Care One then argues that we can find specific intent because the advertisements were "(at best) deceitful half-truths" that advanced the Unions' scheme and whose purpose was to "harm Appellants' business."[52]

Specific intent "may be found from a material misstatement of fact made with reckless disregard for the truth."[53] But reckless disregard for the truth cannot be inferred merely from an intent to injure.[54] Rather, it requires "sufficient evidence to permit the conclusion that the defendant in fact

---

[48] *See* JA 2642 (vetting was conducted on the research side and legal side); JA 5134 (accuracy was the responsibility of "our research team" and "counsel"); JA 3718 (Gladstein explaining that "my researchers" were responsible for accuracy).

[49] JA 5327.

[50] *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 276 (3d Cir. 1980).

[51] Appellant Br. at 43 (citing *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017)).

[52] *Id.* at 42.

[53] *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995) (citation omitted).

[54] *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989).

entertained serious doubts as to the truth of his publication."[55] Failure to investigate before publishing, without more, is not enough to establish reckless disregard.[56]

Care One points to specific ads in claiming that the Unions cherrypicked facts and printed them without regard for necessary context. In the four ads in question, Care One accuses the Unions of wording the ads so that they posed leading questions implying a negative answer and highlighting negative information. According to Care One, the ads then relied upon a non-representative and misleading fact or statistic for support.

For example, as quoted above, Care One points to the advertisements targeting its staffing. Those advertisements ask: "Are HealthBridge Nursing Homes Employing Enough Caregivers For Our Loved Ones?" The ads then assert that Care One provided below-average coverage by certified nursing assistants.[57] The ads omit that Care One facilities provide above-average hours of coverage by higher-skilled registered nurses and licensed practical nurses.[58]

The law of defamation generally recognizes that a question, "however embarrassing or unpleasant to its subject, is not accusation."[59] To premise liability on a question would "necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas."[60] Moreover, the questions' implied answer is merely an unfalsifiable "opinion relating to matters of public concern."[61] Even if the Unions were using the questions to assert that Care One "understaff[s]" its facilities, that assertion would merely compare Care One's staffing to a subjectively chosen standard.

The same analysis applies to the other questions in the Unions' advertisements: "Is HealthBridge Giving Your Loved

---

[55] *Id.* at 688 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

[56] *Id.* (citing *St. Amant*, 390 U.S. at 731, 733).

[57] JA 2491.

[58] JA 3348–49, 5642.

[59] *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (citation omitted).

[60] *Id.* at 1339.

[61] *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) (citation omitted).

One Anti-Psychotic Drugs?,"[62] "Overbilled at a HealthBridge Nursing Home?,"[63] and "Who's in Charge at HealthBridge Nursing Homes?"[64] These are all questions rather than factual misrepresentations. They point out a presumed disparity between HealthBridge's behavior and some subjective standard.

Care One suggests that the statistic in the staffing ad is fraudulent because it implies that Care One understaffs by relying on information pertaining to the only category of staff with below-average staffing. Moreover, Amanda Torres-Price, communications specialist for UHWE, conceded that the advertisements were "not pretending to be objective."[65]

Care One also points out that the antipsychotics advertisement suggesting its facilities excessively administered medications relies on a statistic referring to non-representative groups of patients, for whom the antipsychotic drugs were often medically appropriate. The overbilling advertisements were based on one billing error at only one facility. And the "Who's in Charge" advertisements implied there was an unhealthy amount of turnover but cited turnover rates roughly in line with a state average. Care One does not dispute the actual statistics, merely the implications and the insinuations arising from them.

However, it is neither realistic nor legally required that either side of a labor dispute will present a balanced view in advertisements about the other side arising from the dispute. Moreover, speakers in the public square "have no legal obligation" to ensure that their statements are balanced.[66] For better or worse, the law does not hold either party to a labor dispute to a given level of objectivity.[67] Thus, the Unions did

---

[62] JA 2501.

[63] JA 2477.

[64] JA 2494.

[65] JA 5311.

[66] *Perk v. Reader's Dig. Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991).

[67] This does not, of course, license either side to a labor dispute to say whatever will inflict maximum damage on the other side with absolutely no regard for the accuracy of such statements. Here, as we have discussed, the Unions did have processes in place to maintain a level of accuracy in its public

not need to present a balanced view in their advertisements. For these reasons, we will affirm the District Court's judgment as to the claims of mail and wire fraud.

### 2. Extortion

Care One argues that the District Court erred in granting the Unions' motion for summary judgment because, under RICO, the Unions committed state law extortion through both sabotage and fear of economic loss. For a violation of state extortion law to constitute a RICO predicate offense, the conduct must be "generically classified as extortionate."[68] Even if a predicate act is alleged, a union can be held liable only if "*clear proof* of actual participation in, or *actual* authorization of, such acts, or of ratification of such acts after *actual* knowledge thereof."[69] The generic definition of extortion is "obtaining something of value from another with . . . consent induced by the wrongful use of force, fear, or threats."[70] If an action can be generically classified as extortionate, then it must violate the state extortion statute to constitute a predicate act under RICO.

Care One relies on two purported types of extortionate acts to establish the requisite RICO predicates.[71] It alleges that the Unions committed extortion under New Jersey, Massachusetts, and Connecticut law through (1) sabotage, and (2) fear of economic loss.[72] We will address each claim in turn.

### a. Extortion through Sabotage

Care One contends that, based on the timing of the aforementioned acts of sabotage and the fact that NEHCEU members had access to both the facilities and patients involved, a reasonable jury could infer that union members committed sabotage and that the Unions either authorized these actions or ratified them.[73] We agree. In doing so, we are fully aware that

---

pronouncements, so we do not accept the conclusion that those processes were little more than a Potemkin Village intended only to provide cover so that the Unions could say whatever they thought would damage Care One.

[68] *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003).

[69] 29 U.S.C. § 106 (emphasis added).

[70] *Scheidler*, 537 U.S. at 409.

[71] 18 U.S.C. § 1961(1).

[72] *See* Appellant Br. at 12–14.

[73] *Id.* at 18.

any such inference would need to meet the level of proof required under § 6 of the Norris-LaGuardia Act:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.[74]

The Supreme Court has explained that "'authorization' as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment."[75] Rather, Congress intended to restrict

> liability in labor disputes . . . for unlawful acts of the officers or members [of unions], although [they] are acting within the scope of their general authority as such officers or members [of those unions] . . . except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority [by the union] or was subsequently ratified [by the union] after actual knowledge of its occurrence.[76]

Thus, a labor union cannot be held liable for the actions of its members (even if those members are officers of the union) absent "clear proof of actual participation in, or actual

---

[74] 29 U.S.C. § 106.

[75] *United Bhd. of Carpenters v. United States*, 330 U.S. 395, 406 (1947).

[76] *Id.* at 406–07. The Court noted that the Senate Committee viewed this as "'a rule of evidence,' not a 'new law of agency.'" *Id.* at 402. However, the distinction is purely academic for our purposes and does not affect our analysis. For a thorough discussion of the complete legislative history of § 6 of the Norris-LaGuardia Act, *see id.* at 401–03.

authorization of, such acts, or of ratification of such acts after actual knowledge thereof."[77]  This standard requires "clear, unequivocal, and convincing proof" rather than "a bare preponderance."[78]  District courts must apply the same standard at summary judgment that would apply at trial, asking "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."[79]  Accordingly, because § 6 of Norris-LaGuardia Act requires "clear, unequivocal, and convincing proof" at trial, the same standard of proof would be required at the summary judgment level.[80]

The Court explained in *United Brotherhood of Carpenters and Joiners of America v. United States* that the limitation set forth in § 6 was intended to

> relieve [labor unions] . . . from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member, charged with responsibility for the offense, actually participated, gave prior authorization, or ratified such acts.[81]

When Congress enacted the Norris-LaGuardia Act in 1932, it hoped to "bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management."[82]  Federal courts were then "regarded as allies of management in [their] attempt to prevent the organization and strengthening of labor unions; and in this industrial struggle the injunction became a potent

---

[77] 29 U.S.C. § 106.
[78] *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 737 (1966).
[79] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
[80] *See Gibbs*, 383 U.S. at 737.
[81] *United Bhd. of Carpenters*, 330 U.S. at 403.
[82] *Boys Mkts., Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235, 251 (1970).

weapon that was wielded against the activities of labor groups."[83]

Moreover, in *United Mine Workers of America v. Gibbs*, the Supreme Court noted that while the Labor Management Relations Act passed shortly after the decision in *United Brotherhood of Carpenters* and allowed a less stringent standard of proof, Congress did not repeal § 6.[84] Rather, it "left it applicable to cases not arising under the new Act."[85] The Supreme Court took that opportunity to reiterate that the "fear that unions might be destroyed if they could be held liable for damage done by acts beyond their practical control" was the "driving force" behind § 6.[86] It is therefore now beyond contention that common-law principles of agency and *respondeat superior* have no place in assessing liability of labor unions for the acts of their members or officers for claims (such as the ones before us) not falling under the LMRA.

As this case arises under RICO, the applicable standard of proof is governed by § 6 of Norris-LaGuardia.[87] The District Court did indeed err in employing the less stringent LMRA standard.[88] In doing so, it cited *Carbon Fuel Co. v. United Mine Workers of America*, which explained that, under the LMRA, liability is limited to those who had "authorized, participated in, or ratified" the conduct.[89] However, that error benefitted Care One because it afforded Care One a less stringent standard of proof for surviving summary judgment. Since the investigation resulted in no union members being identified as suspects, we will review whether a jury could

---

[83] *Id.* at 250.

[84] *Gibbs*, 383 U.S. at 736.

[85] *Id*.

[86] *Id.* at 736–37.

[87] *Id.* at 736. *See United Bhd. of Carpenters*, 330 U.S. at 403 (applying § 6 to Sherman antitrust prosecution); *United States v. Kemble*, 198 F.2d 889, 892 (3d Cir. 1952) (applying § 6 to Hobbs Act extortion prosecution).

[88] *Care One*, 2019 WL 5541410, at *6 ("[D]efendants can only be held responsible for the actions of their members if the unions ratified or authorized the acts at issue.") (citing *United States v. White*, 322 U.S. 694, 702 (1944); *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17 (1979)).

[89] *Carbon Fuel*, 444 U.S. at 216.

reasonably find clear proof that the Unions either authorized or ratified the sabotage on this record.

## 1. Authorization

As a threshold matter, Care One here argues that, because the acts committed on the eve of the strike at the three facilities targeted were similar to the sabotage allegedly connected with a strike at another employer's NEHCEU-unionized facility in 2001, we can connect those instances of sabotage and conclude that the Unions authorized the conduct. For support, Care One relies in part upon the "mass action" theory, and cites *Eazor Express, Inc. v. International Brotherhood of Teamsters.*[90] Under the mass action theory, an otherwise inexplicable or improbable pattern of coordinated conduct by union members can be explained by assuming that the pattern resulted from authorization from the union.[91] The premise is that "large groups of [people] do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members."[92]

The mass action theory emerged to address situations in which thousands of members in different locations simultaneously act in concert.[93] In contrast, here, there is no evidence that anything like that number of people engaged in the acts of sabotage and vandalism, and Care One does not contend otherwise.[94] Rather, Care One insists that it is applying the logic underlying the mass action theory and relying on common sense based on the timing and apparent coordination of the actions rather than the mass action theory per se.[95] However, Care One cites no cases that would justify expanding the logic of the mass action theory to the circumstances here, and we have found none. The number of actors here falls woefully short of the numbers needed to infer that the Unions had to have orchestrated these acts. The

---

[90] *Eazor Express, Inc v. Int'l Bhd. of Teamsters*, 520 F.2d 951, 963 (3d Cir. 1975), *overruled on other grounds by Carbon Fuel*, 444 U.S. 212.

[91] *Id.*

[92] *Id.*

[93] *See Consolidation Coal Co. v. Local 2216*, 779 F.2d 1274, 1275 (7th Cir. 1985) (applying mass action to when 350,000 to 450,000 coal miners went on strike).

[94] *See Care One*, 2019 WL 5541410, at *6.

[95] Reply Br. at 6–7.

number is just too small for the presumption of centralized union coordination to apply under that theory. Moreover, even if we were to agree that the timing of the acts suggests unseen coordination, there is nothing to tie it to the Unions rather than a handful of individual union members acting on their own. The contrary assumption on which Care One relies is far too tenuous to rise to the level of substantial proof that § 6 requires.

However, notwithstanding our rejection of Care One's attempt to rely on the logic underlying the mass action theory, we nevertheless conclude that the totality of the circumstances here is enough to allow a reasonable jury to find sufficient proof that the Unions authorized such actions—even applying the heightened burden arising from § 6. As noted above, we must review the evidence in the light most favorable to Care One in reviewing the grant of summary judgment to the Unions. In doing so, we are cognizant of the fact that the Connecticut State's Attorney's investigation identified no suspects, let alone any union-member suspects.[96] And, we are of course aware that union membership alone cannot tie the actions of any members to the Unions, nor give rise to a presumption that the Unions authorized the acts of any of its members. However, the evidence is mutually reinforcing, each piece strengthening the inferences to be drawn from the other. Though no one piece of evidence is sufficient by itself, we must view the evidence in the aggregate. When we review this record in that context, it is clear that a reasonable jury could find there is enough to establish clear proof that members of the Unions committed the acts of vandalism and sabotage and that the Unions authorized that conduct.

This evidence includes the Unions' prior statements, the coordinated timing of the acts of sabotage, and subsequent actions that could be interpreted as obfuscation by the Unions. It is undisputed that, *the night before* multiple union-organized strikes were scheduled to begin, acts of sabotage simultaneously occurred at three Care One facilities. A jury could conclude that was not just a serendipitous coincidence. We realize, of course, that this may have been the result of coordination among various union members acting independently of the Unions. However, there is also evidence that, in advance of that sabotage, the Unions engaged in inflammatory rhetoric and encouraged labor organizers to

---

[96] JA 5779; JA 6840; JA 6843.

"become angry about their working conditions."[97]  They also encouraged members to take on "greater and more militant levels of activity."[98]  The president of one of the Unions told workers that "the law takes too long" and that the Unions "could be destroyed by the time the law was able to stop [Care One's] behavior."[99]  That could certainly be interpreted as a call to engage in illegal acts rather than rely only upon the collective bargaining process.  Thus, when viewed in the light most favorable to Care One, a jury could reasonably see those communications and the multiple, nearly simultaneous acts of sabotage right before a strike as clear proof of the Unions' authorization of the sabotage.  Indeed, a jury could conclude with the requisite quantum of proof under § 6 that the Unions had issued "a call to arms," and the District Court's ruling to the contrary must be vacated.

**2. Ratification**

As explained above, liability can also be established if the Unions ratified the sabotage even if there is insufficient evidence that they authorized it.  Although it is a very close call, we conclude that the undisputed facts viewed in the light most favorable to Care One could be viewed as clear proof that the Unions ratified the sabotage.  To establish ratification, Care One must prove "either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force."[100]

Care One argues that a reasonable jury could find the Unions ratified the sabotage because they did not attempt to assist and failed to cooperate with the police investigation of the sabotage.  It points to an email from Deborah Chernoff, Communications Director of one of the Unions, in which Chernoff wrote that the Unions "sought to 'mudd[y] the waters' and 'rebut, or at least confuse, the sabotage claims'"

---

[97] JA 5852, a facilitator teaching document with the goal of "answer[ing] tough questions and redirect[ing] conversations to an organizing agenda."

[98] JA 5849, a supervisor's evaluation form for an individual organizer.

[99] Appellant Br. at 22.

[100] *Gibbs*, 383 U.S. at 739.

during the investigation.[101] This is a mischaracterization of that email. Chernoff is actually discussing a FOIA request that the Unions made to the Connecticut Department of Public Health. She described the information from the Department of Public Health in response to the Unions' FOIAs—not the Unions' efforts—as "mudd[ying] the waters."[102] She explained that this information "muddie[d] the waters and support[ed] the contention of the workers that" patients may have removed their identifying bracelets themselves rather than saboteurs.[103]

Care One also points to the email from Chernoff to Chas Walker, Elected Organizer of UHWE, and union leaders. That email appears to respond to Walker's suggestion that the Unions launch their own investigation or actively seek to participate in the police investigation. Chernoff wrote that "[the Unions] ha[ve] an obligation to [their] members *even when they are totally in the wrong*, if that proves to be the case."[104] Although that message by itself argues against ratification, the email also stated that it would be "a very bad idea" to participate in the police investigation.[105] Although it is a very close call, we think it best that a jury assess the import and intent of the declaration that it would be a very bad idea to participate in the police investigation in context with any other evidence on this record, in assessing whether there is clear proof that the Unions ratified the acts of sabotage.

Similarly, a jury should assess the significance of Care One's argument that union officials made "no concrete effort to disassociate themselves from the misconduct."[106] This argument relies on *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Loc. Union 639* as support.[107] In *Yellow Bus Lines*, there was evidence that the union's business director, James Woodward, had engaged in several acts of vandalism including

---

[101] Appellant Br. at 25 (alteration in original) (citing JA 5842).

[102] JA 5842.

[103] JA 5842.

[104] JA 5831 (emphasis added).

[105] JA 5831.

[106] Appellant Br. at 26.

[107] 883 F.2d 132, 136 (D.C. Cir. 1989), *on reh'g en banc*, 913 F.2d 948 (1990).

threatening to burn company buses.[108] The president of the union received a letter describing "with particularity 'numerous incidents of threats, violence, property damage, and verbal abuse' by Woodward and other strike participants."[109] There was no evidence that the unions acted to investigate or discipline Woodward (or any other strikers). To the contrary, "Woodward remained on-site as the [union's] man in charge."[110] The court held that evidence was sufficient to show that the union was liable for Woodward's threatening and violent actions because the union's inaction, after learning about his conduct, ratified it.[111]

The key difference here is that the later investigation yielded no suspects and implicated no union members.[112] Still, it is theoretically possible that a jury could conclude that the lack of union-member suspects is the result of the Unions' failure to investigate. We are thus persuaded that, as in *Yellow Bus Lines*, the jury could understand the Unions' perceived "blind eye" as ratification of the conduct.

We are aware that there is also evidence that the Unions outright condemned this behavior, rather than ratified it. For example, Chernoff wrote to fellow employees, "Of course anyone with a peasized brain would realize this isn't a tactic we would undertake."[113] She also wrote that the allegations of vandalism were "very serious indeed" and that those responsible "should be held fully accountable."[114] Although this is an expression of disapproval, a jury could nevertheless conclude that these statements were made only to provide "cover" and that any union members participating in the sabotage would have understood them to be no more than that. This is especially true given the union leader's statements that it was a very bad idea to participate in the police investigation.

Care One also relies upon evidence that the Unions went as far as "authoring a baseless article suggesting that [Care

---

[108] *Id.* at 135.

[109] *Id.* at 136.

[110] *Id.*

[111] *Id.*

[112] *See, e.g.*, JA 5779.

[113] JA 6825.

[114] JA 1068.

One] 'staged the sabotage to make [NEHCEU] look bad.'"[115] The article, written by Chernoff, attributes the "staged the sabotage" quotation to union members who actually disbelieved the allegations of sabotage.[116] Nevertheless, we cannot conclude that a jury should disregard the fact that the Unions published such an article when considering if Care One established that the Unions ratified the acts of sabotage. Accordingly, we hold that the District Court erred in determining that the totality of the evidence here is insufficient to support a claim that the Unions ratified the alleged acts of sabotage.

**b. Extortion Through Fear of Economic Loss**

Care One also argues that the Unions are liable for extortion through fear of economic loss under RICO because they (1) "engaged in wrongful conduct by using threats of regulatory interference and criminal prosecution to seek leverage over" Care One, and (2) sought to "drive patients away from [Care One's] facilities and to . . . harm . . . one of [Care One's] owners" through "campaigns of negative publicity and harassment."[117] It is uncontested that the Unions authorized both its use of the regulatory and criminal processes and the public speech and publicity campaign.[118] Thus, the clear proof standard under § 6 of the Norris-LaGuardia Act is satisfied if such actions constitute extortion under state law and are generically classifiable as extortionate.[119]

The generic definition of extortion is "obtaining something of value from another with his consent induced by the *wrongful* use of force, fear, or threats."[120] The District Court relied on *United States v. Enmons*[121] to determine whether the Unions' conduct was wrongful.[122] *Enmons* created the "claim-of-right" defense—a carve-out from Hobbs

---

[115] Appellant Br. at 25–26 (second alteration in original) (citing JA 5825).

[116] JA 5825.

[117] Appellant Br. at 13–14.

[118] The Unions have never denied their role in these efforts. *See generally* Appellee Br.

[119] 29 U.S.C. § 106.

[120] *Id.* at 409–10 (emphasis added).

[121] 410 U.S. 396 (1973).

[122] *Care One*, 2019 WL 5541410, at *7.

Act liability for a union pursuing legitimate labor objectives.[123] *Enmons* does not control here, however, since there, the Supreme Court interpreted Hobbs Act extortion, not the generic definition of extortion, and it relied heavily on the Hobbs Act's legislative history indicating a congressional intent to steer the statute's sanctions away from legitimate labor activity.[124] Nevertheless, *Enmons* provides helpful guidance because extortion under the Hobbs Act and the generic definition both include a "wrongful use of fear" element.[125] Our subsequent application of *Enmons* outside the labor context also suggests that it provides appropriate guidance here.[126]

As mentioned above, in determining whether the "wrongful" element had been satisfied under the Hobbs Act, the *Enmons* Court formulated the "claim of right defense."[127] The claim of right defense hinges on a defendant's lawful claim to the objective sought through the alleged extortionate acts.[128] Though known as a "defense," this "is not actually an 'affirmative defense' in this context[, but] an interpretation of what 'wrongful use of fear' . . . means."[129] In other words, the wrongful use of fear element is not satisfied if a defendant had a lawful claim to the objective sought. As explained below, outside the Hobbs Act labor context, we have found that this lawful claim requires that the defendant have a right to both the

---

[123] *Enmons*, 410 U.S. at 400.

[124] *Id.* at 401–08.

[125] *Compare* 18 U.S.C. § 1951(b)(2) ("obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"), *with Scheidler*, 537 U.S. at 410 ("obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats").

[126] *See, e.g.*, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998); *United States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998).

[127] *Enmons*, 410 U.S. at 400.

[128] *Id. See also United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir. 1979).

[129] *United Broth. of Carpenters and Joiners of Am. v. Bldg. and Const. Trades Dep't*, 770 F.3d 834, 844 (9th Cir. 2014) (citing *Brokerage Concepts, Inc.*, 140 F.3d at 523).

objective sought and the means used in pursuing such objective.

We have applied this claim of right defense outside the labor context for situations "involv[ing] solely the allegation of the use of economic fear in a transaction between two private parties."[130]  First, in *United States v. Cerilli*, we found that "although the solicitation of political contributions is not inherently 'wrongful,'" it was wrongful for defendants to condition the leasing of government equipment on contributions because they did not have a "'lawful claim' to those contributions."[131]  Similarly, in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, we found that an extortion claim could survive only if the plaintiff had a right to pursue its business interest free of the fear that it would be excluded from a healthcare provider network.[132]  We concluded that no such right existed because Pennsylvania did not require all interested providers be included in the network.[133]  The defendant had thus acted under a "claim of right" because it "had the right to exchange the valuable consideration of inclusion in its network in return for consideration from" the plaintiff.[134]  In *United States v. Tobin*, we later interpreted *Brokerage Concepts* as holding that "the claim-of-right defense applies to non-labor cases, so long as the threats involved are purely economic."[135]

Our inquiry here is aided by contrasting *Brokerage Concepts* with *Tobin*.[136]  In *Tobin*, we concluded that the claim of right defense "plainly" did not apply where a defendant "threatened *unrelated* lawsuits alleging sexual harassment" instead of "legal action to enforce the oral contract that she

---

[130] *Brokerage Concepts*, 140 F.3d at 503.  *See also Cerilli*, 603 F.2d at 419 (finding that the claim of right defense did not apply where a government's leasing of equipment was conditioned on political payments).

[131] *Cerilli*, 603 F.2d at 419.

[132] *Brokerage Concepts*, 140 F.3d at 503.

[133] *Id.*

[134] *Id.* at 526.  *Cf. Cerilli*, 603 F.2d at 419 (finding that the defendant had not acted under a claim of right because it did not "ha[ve] a 'lawful claim' to th[e] contributions" sought).

[135] 155 F.3d at 640.

[136] *Id.*

27

claimed existed."[137]  In doing so, we explained that the plaintiffs "had a preexisting right to be free from the threats invoked[, which] . . . went far beyond the hard bargaining tactics utilized in *Brokerage Concepts*."[138]  We also distinguished the acts in *Tobin* from those in *Viacom International, Inc. v. Icahn* in which "a corporate raider . . . amassed Viacom stock and threatened a corporate takeover unless the company purchased his stock at a premium over the market price."[139]  The *Viacom* court held that the claim of right defense applied because the plaintiff "did not have a preexisting right to be free from the threat of a takeover."[140]

Applying those cases here, we ask whether Care One had the right to pursue its business interests free of the fear that the Unions would (1) use the regulatory and criminal processes, and/or (2) campaign using negative advertising. More specifically, drawing from *United States v. Jackson*,[141] we ask whether there is a reasonably close relationship—a nexus—between the alleged extortionate acts and the objective sought.  In *Jackson*, the Court of Appeals for the Second Circuit concluded that "where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful."[142]  This test tracks

---

[137] *Id.*

[138] *Id.*

[139] *Id.* (citing 747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd on other grounds*, 946 F.2d 998 (2d Cir. 1991)).

[140] *Id.* (citing *Viacom*, 747 F. Supp. at 213).

[141] 180 F.3d 55 (2d Cir. 1999).

[142] *Id.* at 71.

*Enmons*,[143] *Cerilli*,[144] *Brokerage Concepts*,[145] *Tobin*,[146] and *Viacom*.[147]

However, we must also consider any potential chilling effect or further risk of "erosion of the associative rights or at least the full exercise of such rights."[148] This, of course, is not a new concern in terms of civil RICO generally.[149] But we

---

[143] In *Enmons*, violence during a lawful strike had a reasonably close relationship to the union's demand for higher wages and was not considered wrongful. *See* 410 U.S. at 411.

[144] In *Cerilli*, leasing of government equipment did not have a reasonably close relationship to conditional political payments and was considered wrongful. *See* 603 F.2d at 419.

[145] In *Brokerage Concepts*, excluding from the provider network had a reasonably close relationship to Brokerage Concepts's demands to have the pharmacy use its subsidiary as its third-party administrator and was not considered wrongful. *See* 140 F.3d at 523.

[146] In *Tobin*, threatening the plaintiff with unrelated lawsuits regarding sexual harassment was explicitly described as unrelated (*i.e.*, no reasonably close relationship) to Tobin's demand to enforce the oral contract and was considered wrongful. 155 F.3d at 640–41 ("[S]he threatened unrelated lawsuits . . . .").

[147] In *Viacom*, threatening a corporate takeover was directly related to a corporate raider's demand that the company purchase his stock at a premium and was not considered wrongful. *See* 747 F. Supp. at 213–14.

[148] David B. Sentelle, *Civil RICO: The Judges' Perspective, and Some Notes on Practice for North Carolina Lawyers*, 12 CAMPBELL L. REV. 145, 165 (1990).

[149] *See* Marvin L. Astrada, *Examining the Present Security-Liberty Nexus: Civil RICO—Remedy to Procure Security or Threat to Civil Liberty?*, 36 QUINNIPIAC L. REV. 357, 377–81 (2018) (critiquing civil RICO's potential encroachment on First Amendment freedoms of speech and assembly); Sentelle, *supra* note 162, at 161 ("RICO devours traditional and basic concepts of American jurisprudence, including . . . First Amendment rights of free speech and association [and] labor law . . . ."). *See also Yellow Bus Lines, Inc.*, 883 F.2d at 145 (Edwards, J., concurring) ("I have nagging doubts about

must be particularly mindful given that this case involves labor unions—entities that have historically been granted special protections because they sometimes employ tactics that often inflict economic loss on employers in order to advance the legitimate interests of the union's members. In fact, a strike is the quintessential example of an action that is taken to instill fear of economic loss and possibly even inflict economic harm on an employer who might otherwise not agree to a union's demands. Thus, we must be careful not to impose liability for either protected commercial speech, peaceful off-site picketing, or threats of economic harm related to a labor dispute such as a strike or the threat of a strike.

Viewing the facts in the light most favorable to Care One, drawing all reasonable inferences in Care One's favor, and being mindful of the need for unions to sometimes resort to threat of economic harm, there remains a question of fact as to whether the Unions committed extortion through fear of economic loss. As stated above, our inquiry first asks whether the Unions' use of the regulatory and criminal processes and campaigns of negative advertising was wrongful. Again, to do so we must assess whether Care One had the right to pursue its business interests free of the fear that the Unions would (1) use the regulatory and criminal processes, and (2) campaign using negative advertising. Clearly, Care One has no categorical right to pursue its business interests free of the fear that the Unions could use the regulatory and criminal processes as these processes can hold individuals and entities accountable for violating laws and regulations.[150] Additionally, Care One did not have a limitless right to pursue its business interests free of the fear that the Unions could use negative advertising campaigns. Not only do such campaigns implicate protected speech, but they are also a frequent component of labor strife including strikes.[151] Indeed, pickets circling with signs disparaging an employer's working environment or allegedly

---

our holding that 'the strike and organizational effort were "affairs" of Yellow Bus,' and that, consequently, plaintiff might be able to state a cause of action under section 1962(c) of RICO. This result seems strangely at odds with certain fundamental precepts of labor law and collective bargaining.").

[150] *See* 29 U.S.C. § 158(a)(4).

[151] *See id.* §§ 157, 158(a)(1).

poor wages is a common sight outside of businesses that have been hit with a strike. Because, generally speaking, Care One did not have a right to pursue its business interests free of these fears, the Unions had a right to pursue favorable terms in a collective bargaining agreement by employing such tactics, but *only if* there is a nexus between this objective and the means used.

Turning first to the Unions' use of regulatory and criminal processes, it is unclear whether the Unions were using these means to pursue the aforementioned legitimate objectives. There is, of course, nothing wrong with the Unions exercising their right to report violations of the law through either regulatory or criminal processes. But if the Unions implicitly intended to use these channels as a means to pursue their objective, then liability would turn on whether there is a nexus between using these processes and pursuing favorable terms in a CBA. The record, however, is not conclusive on that issue. Therefore, this is a question of fact that a jury should decide, and summary judgment in favor of the Unions was inappropriate.[152]

Turning next to the Unions' campaigns, Care One points to the Unions' advertising campaign and the campaign directed at Care One's owner and CEO, Daniel Straus as campaigns "of negative publicity and harassment" constituting extortion. Considering first the advertising campaign, the

---

[152] For example, the Unions called Senator Blumenthal without notice to Care One, which points towards a finding that this was not a means to pursue favorable terms in a CBA. *See Care One*, 2019 WL 5541410, at *8 (citing D.E. 402-4 ¶¶ 61–64). But they had urged him to carbon copy the CEO of Care One on a relevant email, which was arguably for the purpose of alerting Care One that they intended to pursue regulatory processes if Care One did not comply with union demands. **JA 5613.** There is also no evidence that the Unions' pursuit of criminal charges against Care One implied "that the Unions would continue their coercive pressure unless Appellants acceded to the Unions' demands." Appellant Br. at 31–32. Without an explicit objective or something akin to a "wink and a nod," whether this was "part of [a] broader campaign to exert pressure on [Care One]" is unclear and would thus need to be decided by a jury. *Id.* at 33 n.7.

relationship of that campaign to a legitimate labor objective is clear. The Unions argue that they never made a threat to force Plaintiffs to comply with any demand, and the record as to the advertising campaign is not to the contrary.[153] They claim that the objective of this campaign was to pursue higher wages and better benefits for its members,[154] and again, Care One has not presented evidence to the contrary.

Care One also points to the campaign directed at Straus. This included "targeting [his] unrelated business ventures and philanthropic activities," "block[ing] the development of a condominium project in which Mr. Straus had invested," "purchasing radio advertisements in Puerto Rico to disparage two unrelated businesses Mr. Straus owned there," and "organizing disruptive protests around NYU School of Law, where Mr. Straus was a trustee and benefactor."[155] As the District Court explained, these activities likely drew "public attention to Straus' role in Plaintiffs' business and labor practices."[156] Care One's only evidence to the contrary is that "the Unions could not [have] hope[d] to derive any legitimate benefit from these pressure tactics" as "the Unions did not represent employees in connection with any of the unrelated ventures and philanthropic activities that they targeted."[157] This ignores the clear nexus between pressure tactics that drew attention to the *owner* of Care One's business and labor practices and the Unions' objective of receiving higher wages and better benefits from Care One. The Unions could logically assume that pressuring Straus in this manner would increase the likelihood that he would cause Care One to capitulate to the Unions' demands. Accordingly, as is true with the advertising campaign, we cannot find that tactic wrongful as a matter of law under the generic definition of extortion. Therefore, summary judgment in favor of the Unions was appropriate on these claims.

**IV. Conclusion**

For the reasons set forth above, we will vacate in part and affirm in part and remand to the District Court for further proceedings consistent with this opinion.

---

[153] Appellee Br. at 29.

[154] *Id.* at 8.

[155] Appellant Br. at 34.

[156] *Care One*, 2019 WL 5541410, at *8.

[157] Appellant Br. at 35.